The following question was certified to this Court so that we might ". . . answer a question of law which is deemed determinative of an action before [the U.S. District Court and to which [there is no clear controlling precedent in the decisions of the Supreme Court of Alabama."
 "Does defendant's failure, which was not willful, to obtain a license according to Section 5-19-22 affect plaintiff's obligation under the loan contract between plaintiff and defendant, and if so, to what extent?"
The order entered by the U.S. District Court contained the following statement of the underlying facts in this case:
 "Defendant Thomas R. Duncan conducted a business in Montgomery, Alabama, known as Federal Building Service. In the summer of 1978, defendant, or his representative, contacted plaintiff Mattie Derico to solicit the business of making repairs to her home and placing siding thereon for the cash price of $6,381.00. In addition to the work which defendant would perform on plaintiff's house, defendant Duncan agreed to satisfy an outstanding bond for title contract on plaintiff's home held by Mrs. Flora Davis in order to obtain a first mortgage on plaintiff's home. The amount of this outstanding bond for title contract was $7,619.00. It carried an interest rate of 8 per cent annually. *Page 29 
 "Defendant Duncan and Mrs. Derico signed a document entitled `Agreement,' which recited that the total cash price of the transaction, including the cost of satisfying the obligation to Mrs. Davis on the bond for title, was $14,000.00. The entire amount was to be financed at a 12.78 per cent annual rate of interest. Under her agreement with defendant, plaintiff executed a mortgage on her home in favor of defendant for the total amount of her indebtedness which, including interest, would be an amount of $27,439.20.
 "Evidence presented at trial established that during the period from April, 1978 to August, 1978, Defendant Duncan entered into approximately twenty agreements by which defendant agreed to repair a customer's residence and satisfy an outstanding mortgage or other obligation of the residence's owner, in return for a cash price, plus interest and a new mortgage securing the customer's total indebtedness to defendant."
Our answer to the question posed is based upon our interpretation of Code 1975, § 5-19-1 et seq., "Consumer Finance" (known as the Mini-Code), and of the specifically applicable provisions thereof.
It is uncontroverted that Defendant, in failing to obtain a license "to engage in the business of making consumer loans," was in direct violation of § 5-19-22 (a), which states in pertinent part:
 "(a) No creditor shall engage in the business of making consumer loans . . . without first having obtained a license for each location from the administrator;
. . ."
The instant controversy arises from the parties' respective contentions as to the effect the Defendant's failure to obtain the required license has on the contract here in issue and its resulting obligations.
Defendant concedes his failure to obtain the required license, but maintains that the exclusive statutory remedy for a violation of § 5-19-22 (a) is found in § 5-19-30, which states:
 "(a) A creditor who . . . willfully engages in the business of making loans in violation of subsection (a) of section 5-19-22 is guilty of a misdemeanor
and, upon conviction, will be sentenced to pay a fine not exceeding $500.00 or to imprisonment not exceeding one year, or both." (Emphasis supplied.)
The Plaintiff, however, reasons that § 5-19-22 is a "regulatory statute" and, therefore, that Defendant's violation of that statute renders the loan agreement between the parties null and void.
The District Court, in posing the question for certification to this Court, states that Defendant's failure to obtain the required license was "not willful."[1] That being so, were we to accept Defendant's reasoning, he would avoid any and all penalty for his unlawful conduct which, during 1978, manifested itself in "approximately twenty agreements" similar to the one here. We hold that established Alabama law mandates our rejection of Defendant's contention.
As early as 1918, this Court specifically and unequivocally held:
 "The rule in this state is that, if a statute was not designed to prohibit the making of contracts without previous compliance with statutory provisions, but was intended merely to provide revenue, it is not void if no specific prohibition or penalty is provided or imposed. If the conditions of the statute were made for the benefit of the public, and not for the raising of revenue only, an agreement is void that does not comply with the statutory conditions." Bowdoin v. Alabama Chemical Co., 201 Ala. 582, 583, 79 So. 4 (1918).
In succeeding years this Court has not departed from the standard as announced in Bowdoin, and contracts made in violation of regulatory statutes enacted for the protection of the public have been rendered null and unenforceable. SeeSouthern Metal *Page 30 Treating Co. v. Goodner, 271 Ala. 510,125 So.2d 268 (1960) (engineer statute); Faulkner v. Stapleton Insurance RealtyCorp., 266 Ala. 437, 96 So.2d 761 (1957) (real estate broker statute); Bankers Shippers Insurance Co. v. Blackwell,255 Ala. 360, 51 So.2d 498 (1951) (federal motor carrier statute);Knight v. Watson, 221 Ala. 69, 127 So. 841 (1930) (real estate broker statute).[2]
In turning to the statute now before us, we observe that the tenor of the Mini-Code, when the chapter is perceived as a whole, is one of consumer (public) protection. § 5-19-2 creates a Consumer Protection Council. § 5-19-6 requires that a highly visible warning be printed on instruments to be signed by debtors which cautions the borrower to "thoroughly read the contract" before signing it. § 5-19-11 requires that before bringing an action for collection a creditor must file an affidavit stating that there "has not been a violation of the provisions of this chapter." A "buyer's right to cancel" a home solicitation sale is provided for in § 5-19-12. Under the terms of § 5-19-16, if a court finds that the terms of an agreement made under this chapter are unconscionable, the court "may refuse to enforce the agreement, or it may enforce the remainder of the agreement without the unconscionable provision, or it may so limit the application of any unconscionable provision as to avoid any unconscionable result." § 5-19-19 sets out the liabilities of a creditor who makes excess finance charges. The power and authority to enforce the provisions of the Mini-Code are given to an administrator by § 5-19-21. § 5-19-22 requires that any creditor in the business of making consumer loans or taking assignments of consumer credit first obtain a license. §5-19-23 states the grounds for the revocation or suspension of the aforementioned license. § 5-19-24 gives the administrator the authority to investigate the Mini-Code licensees and §5-19-25 gives the administrator the power to issue cease and desist orders to Mini-Code licensees. § 5-19-29 gives the administrator the authority to bring an action to enjoin violations of this chapter and § 5-19-30 sets out the penalties for various willful violations of the Mini-Code.
Taking into consideration, then, the overall scheme of the Mini-Code and the reasoning set out in Cooper v. Johnston,283 Ala. 565, 219 So.2d 392 (1969) (recently reaffirmed in Hawkinsv. League, 398 So.2d 232 (Ala. 1981)), we hold that the legislature enacted the Mini-Code "for regulation and protection as distinguished from a law created solely for revenue purposes." Cooper at 567, 219 So.2d 392. In Cooper, this Court considered the Alabama statute which regulates the business of general contracting and concluded that the "primary purpose [of this statute] was to protect the public against incompetent contractors . . . and also to assure properly constructed structures . . . free from defects and dangers to the public." The statutory factors which led to this conclusion were the examinations required for all applicants for a contractor's license, the administration of the statute's provisions by a Board which considered the financial condition
of each applicant and held the power to revoke licenses for various infractions of the statutory requisites.
Section 5-19-22, the licensing provision of the Mini-Code, is unequivocal in its requirement that those creditors who make consumer loans shall not engage in that business without first having obtained a license to do so. Furthermore, this particular section requires that:
 "(b) The license application shall be in writing, under oath, in the form prescribed by the administrator and shall be accompanied by an investigation fee of $100.00.
 "(c) Upon receipt of the application and investigation fee, the administrator shall investigate the applicant and determine whether the license should be issued or denied.
 "(d) No license shall be issued unless the administrator determines that the financial responsibility, character and fitness *Page 31 
of the applicant, and of the members thereof if the applicant is a partnership or association, officers and directors thereof if the applicant is a corporation are such as to warrant belief that the business will be operated honestly and fairly within the purpose of this chapter and finds that the applicant has assets available for the operation of business under this chapter of at least $25,000.00.
". . .
 "(g) The license shall be in the form prescribed by the administrator, posted conspicuously in the place of business of the licensee and shall not be assignable or transferable or removed to another location without permission of the administrator."
We can see one purpose for the legislature's painstaking delineation of these requirements: the protection of the public when dealing with those who make consumer loans through the strict regulation and supervision of the creditors themselves. Section 5-19-22 is clearly regulatory in nature and not, as defendant would have us hold, merely revenue-producing. Indeed, "[i]t occurs to us that if the legislature had intended the [statute] to be primarily for revenue purposes, it well could have omitted authority to revoke the license. The [fee] collected, revocation of the license would not be necessary. Payment would end the matter." Cooper, supra, at 568,219 So.2d 392.
Having found, then, that the aim of both the entire Mini-Code and § 5-19-22 is the protection of the consumer — or, in the language of our above-cited decisions, "the public" — we must concomitantly hold that § 5-19-30 is not the exclusive source of remedies for violations of the Mini-Code's sections. Indeed, as we have always held to be the law in Alabama, whenever regulation and protection are the goal of a statute, contracts made in derogation of that statute are null, void, and unenforceable. Indeed, that the legislature has seen fit to declare that certain willful violations of the statute are "misdemeanors" and to provide specific penalties therefor, strengthens our finding of the regulatory nature of the Mini-Code rather than, as Defendant suggests, excludes all remedies except those found within the limits of § 5-19-30.
We conclude that the provisions of Code 1975, § 5-19-1 etseq., "Consumer Finance," known collectively as the Mini-Code, are regulatory in nature and are for the protection of the public, specifically, the consumer/debtor.
In this context, then, we have examined the Mini-Code in the light of applicable Alabama law and we hold that contracts made in violation of the requirements of the Mini-Code are null, void, and unenforceable as a matter of public policy. Further, we hold that, notwithstanding Defendant's non-willfulness in failing to obtain a license to engage in the business of making consumer loans, that failure was in direct violation of §5-19-22 (a). Therefore, that portion of Plaintiff's indebtedness represented by the loan (as distinguished from the debt on the contract to repair) is void, including both the principal and the interest. However, the interest charges on the voided loan cannot be added to the construction debt so as to render those charges usurious.
CERTIFIED QUESTION ANSWERED.
All the Justices concur.
[1] The Mini-Code's only reference to "willfully" is contained in § 5-19-30 (a), which prescribes the "scienter" requisite for a criminal conviction.
[2] For an excellent discussion of the rule and its application, see Sunflower Lumber Co. v. Turner Supply Company, 158 Ala. 191,48 So. 510 (1909).