ALAN M. SOLOMON ET AL. *v.* WILLIAM C. GILMORE ET AL.
(SC 15914)

Callahan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued January 22—officially released May 25, 1999

*Lori Welch-Rubin,* for the appellant (named defendant).

*Kevin E. Dehghani,* with whom, on the brief, were *Frank S. Marcucci* and *Scott A. Carta,* law student intern, for the appellee (named plaintiff).

*Opinion*

BORDEN, J. The sole issue in this certified appeal is whether a secondary mortgage issued by an unlicensed lender in violation of General Statutes § 36a-511[1] is enforceable in a foreclosure action. Following our grant of certification to appeal,[2] the named defendant, William C. Gilmore,[3] appeals from the Appellate Court's judg-

---

[1] General Statutes § 36a-511 (formerly § 36-224b) provides: "(a) No person shall engage in the secondary mortgage loan business in this state as a lender or a broker unless such person has obtained a license under sections 36a-510 to 36a-524, inclusive. For the purposes of said sections, a person shall be deemed to be engaged in the secondary mortgage loan business if such person advertises, causes to be advertised, solicits, offers to make or makes a secondary mortgage loan, either directly or indirectly. A person shall not be deemed to be engaging in the secondary mortgage loan business if in the course of the person's business as a licensed real estate broker, an accountant, or an attorney, the person negotiates a secondary mortgage loan, and the beneficiaries of a licensee's estate shall not be deemed to be engaging in such business unless such beneficiaries make new secondary mortgage loans.

"(b) Each secondary mortgage loan negotiated, solicited, placed, found or made without a license shall constitute a separate violation for purposes of section 36a-50."

[2] We granted the named defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that a mortgage loan issued by a lender in violation of General Statutes § 36a-511 is enforceable in a foreclosure action?" *Solomon* v. *Gilmore,* 244 Conn. 925, 714 A.2d 11 (1998).

[3] Although the named defendant's wife, Cheryl A. Gilmore, was also a defendant in the underlying foreclosure action, she was not named as a party to the appeal. The named defendant, however, appealed pro se, and

ment affirming the trial court's judgment of strict fore-closure in favor of the plaintiffs, Alan M. Solomon and Mary Ellen Tomeo. The defendant claims that a secondary mortgage loan issued by a lender in violation of the licensing requirements of § 36a-511 is not enforceable in a foreclosure action. We agree.[4] Accordingly, we reverse the judgment of the Appellate Court.

The Appellate Court opinion provides the following facts and procedural history relevant to this certified appeal. "The plaintiffs commenced this action by a complaint alleging that they had loaned the defendants $55,000, which loan was memorialized by a promissory note dated May 30, 1989, and was secured by a second mortgage encumbering property known as 44 Bradford Corner Road in the town of Woodstock. The plaintiffs alleged that the defendants failed (1) to pay monthly installments on the loan after May 5, 1993, (2) to keep the property insured, and (3) to pay property taxes. As a result of these alleged breaches of the mortgage agreement, the plaintiffs accelerated payment of the debt.

"The defendants filed an answer denying that any money was owed to the plaintiffs. The defendants also

it is undisputed that both individuals are named as borrowers on the note. Moreover, both names are listed on the statement of issues that the named defendant, pursuant to Practice Book § 63-4, formerly § 4013, attached to the endorsed appeal form he submitted to the Appellate Court. In addition, the designation of pleadings, submitted pursuant to § 63-4, lists the defendant as "William C. Gilmore, et al." Thus, consistent with our traditional lenient application of certain procedural rules to pro se defendants; see *Hartford National Bank & Trust Co.* v. *DiFazio*, 177 Conn. 34, 39 n.2, 411 A.2d 8 (1979); this decision applies to Cheryl A. Gilmore as if she properly had been named as a defendant in this appeal. Hereafter, references to the defendants are to William C. Gilmore and Cheryl A. Gilmore, collectively, and references to the defendant are to William C. Gilmore, individually.

[1] The certified question concerns only the enforceability of the secondary mortgage loan in the foreclosure proceeding. Thus, the issue of whether the plaintiffs may bring an action on the promissory note is not before us. In addition, although the defendant urges us to consider his usury claim on

filed seven special defenses[5] and a six count counter-
claim.[6] Pursuant to General Statutes § 52-97,[7] the trial
court granted a motion to bifurcate the trial. Thereafter,
the plaintiffs filed separate motions for summary judg-
ment. Solomon submitted a supplemental affidavit in

which he also had sought review, we did not certify this issue. We therefore
do not address it.

[5] The defendants special defenses alleged: (1) payment of the note in full
or in part; (2) violation by the plaintiffs of the federal Truth in Lending Act;
15 U.S.C. § 1601 et seq.; (3) breach of the fiduciary duty owed to the defen-
dants by Steven Tomeo, the husband of Mary Ellen Tomeo, who previously
had acted as the defendants' attorney in a transaction related to the mortgage
at issue, including the allegation that the plaintiffs were not licensed lenders
as required by § 36a-511 (a); (4) reinstatement of the mortgage by virtue of
certain payments made by the defendants to the plaintiffs in July, 1994; (5)
violation of the laws governing the rate of interest permitted to be charged
on loans of this type; (6) breach of the implied covenant of good faith and
fair dealing; and (7) violation of the obligation pursuant to General Statutes
§ 42a-1-203 to act in good faith in the performance or enforcement of a
negotiable instrument.

[6] In their counterclaim, which, with the exception of the sixth count,
paralleled the allegations contained in their special defenses; see footnote
5 of this opinion; the defendants sought, inter alia: (1) rescission of the
contract; (2) termination of the plaintiffs' security interest, created by the
mortgage at issue, in the defendants' property; (3) a declaratory judgment
that the defendants' obligations under the note and mortgage were dis-
charged; (4) the costs of bringing each of their actions; and (5) money
damages for the losses suffered due to the alleged breach of the implied
covenant of good faith and fair dealing, breach of the fiduciary duty owed
by Steven Tomeo to the defendants, and violation of General Statutes § 42a-
1-203.

In the sixth count of their counterclaim, the defendants additionally
alleged that the plaintiffs' conduct constituted an unfair or deceptive act or
practice in violation of General Statutes § 42-110b of the Connecticut Unfair
Trade Practices Act (CUTPA). The defendants thus sought money damages
pursuant to General Statutes § 42-110g (a), as well as additional renumera-
tion for the costs of bringing the CUTPA action.

[7] General Statutes § 52-97 provides in relevant part: "In any civil action
the plaintiff may include in his complaint both legal and equitable rights
and causes of action, and demand both legal and equitable remedies . . . .
[I]n any case in which several causes of action are joined in the same
complaint, or as matter of counterclaim or set-off in the answer, if it appears
to the court that they cannot all be conveniently heard together, the court
may order a separate trial of any such cause of action or may direct that
any one or more of them be expunged from the complaint or answer."

support of his motion for summary judgment.[8] On April 26, 1996, the trial court, *Sferrazza, J.*, issued a memorandum of decision granting, in part, both plaintiffs' motions. On June 3, 1996, the issues not disposed of by way of summary judgment were tried to the court, *Loiselle, J.*, and a judgment of strict foreclosure was rendered." *Solomon* v. *Gilmore*, 48 Conn. App. 80, 82–83, 707 A.2d 746 (1998).

The defendant appealed from the judgment to the Appellate Court. The Appellate Court affirmed the judgments of the trial courts granting the plaintiffs' motions for summary judgment and rendering a judgment of strict foreclosure against the defendants; id., 81–82; and decided each of the defendant's remaining claims adversely to him.[9] Id., 87. This appeal followed.

The defendant claims that the Appellate Court improperly concluded that a secondary mortgage issued by a lender in violation of the licensing requirements of § 36a-511 is enforceable against a mortgagor in a foreclosure action. We agree.

---

[8] The paragraph relevant to this present appeal provided: "At the time of the making of the loan which is the subject of this foreclosure action, I was exempt from the license requirement of [General Statutes] § 36a-511 (formerly § 36-224b) because I granted fewer than [five] secondary mortgage loans in the twelve consecutive months prior to the making of this loan, and I granted fewer than [five] secondary mortgage loans in the twelve months following the making of this loan. I did not make any loans in any twelve consecutive months where the aggregate of said loans exceeded $100,000."

General Statutes § 36a-512 provides in relevant part: "The following are exempt from the licensing requirements of sections 36a-510 to 36a-524, inclusive . . . (5) persons granting five or fewer secondary mortgage loans within any twelve consecutive months, provided (A) the aggregate total of such loans does not exceed one hundred thousand dollars, [and] (B) *each individual loan does not exceed twenty thousand dollars* . . . ." (Emphasis added.) It is undisputed that the plaintiffs had loaned the defendants an amount in excess of $20,000 and, therefore, were not exempt from the license requirement of § 36a-511.

[9] Because the defendant sought certification only on the licensing and usury issues; see footnote 4 of this opinion; the sole issue remaining in the case is whether the secondary mortgage loan is enforceable.

In concluding that the only material fact that existed was "whether the defendants [had] paid or tendered payment of the mortgage debt in full upon demand," the trial court implicitly rejected the defendants' claim that, as a matter of law, the mortgage was illegal because the plaintiffs' were not licensed secondary mortgage lenders.[10] The Appellate Court agreed, stating that "[s]ince the absence of a license on the part of the plaintiffs would make no difference in the result of the case, it is not a material fact for purposes of summary judgment." *Solomon* v. *Gilmore*, supra, 48 Conn. App. 86.

General Statutes §§ 36a-510 through 36a-524, the secondary mortgage act, regulate the conduct of persons engaging in certain secondary mortgage loan transactions. This court has not previously considered the issue of whether a mortgage taken by a lender who is unlicensed in contravention of the secondary mortgage act is enforceable. Our approach to this question, however, is guided by three well settled principles of law. First, in light of the fact that § 36a-511 does not expressly address the enforceability of a contract entered into by an unlicensed lender, we undertake our consideration of this question bearing in mind that in construing statutes, "our fundamental objective [is to ascertain and give effect] to the apparent intent of the legislature." (Internal quotation marks omitted.) *Packer* v. *Board of Education*, 246 Conn. 89, 115, 717 A.2d 117 (1998). Second, it is well established that contracts that violate public policy are unenforceable. *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 231, 635 A.2d 798 (1994). Third, the secondary mortgage act is a remedial statute that is intended to protect the consumer. Thus, because "remedial statutes should be construed liberally in favor

---

[10] As part of their third special defense; see footnote 5 of this opinion; the defendants had alleged that, because the plaintiffs were not licensed secondary mortgage lenders, the contract was in violation of § 36a-511. The defendants made this same argument in their memorandum of law in support of their objection to Solomon's motion for summary judgment.

of those whom the law is intended to protect"; *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 18, 688 A.2d 306 (1997); we liberally construe the secondary mortgage act in favor of the defendant.

We begin with a review of the various provisions governing secondary mortgage lenders in this state. Secondary mortgage lenders are regulated through a comprehensive statutory scheme that includes, in addition to a licensing requirement, rules that impose certain obligations on secondary mortgage lenders, as well as rules that prohibit lenders from engaging in certain activities. Penalties are available to ensure compliance with these mandates.

As noted, § 36a-511 (a) prohibits persons from "engag[ing] in the secondary mortgage loan business in this state as a lender or a broker unless such person has obtained a license . . . ." See footnote 1 of this opinion. General Statutes § 36a-513 details the specific requirements and steps of the license application process.[11] General Statutes § 36a-512 sets forth the persons exempt from the license requirement.[12]

---

[11] General Statutes § 36a-513 (formerly § 36-224d) provides: "(a) An application for a secondary mortgage loan license or renewal of such license shall be in writing, under oath and on a form provided by the commissioner.

"(b) The application shall set forth: (1) The name and address of the applicant; (2) if the applicant is a firm or partnership, the names and address of each member of the firm or partnership; (3) if the applicant is a corporation, the names and address of each officer, director, authorized agent and each shareholder owning ten per cent or more of the outstanding stock of such corporation; (4) if the applicant is a trust or the lead lender in one or more participation loans, the name and address of each trustee or lead lender and each beneficiary of the trust or other participant lenders in all outstanding participation loans, respectively; and (5) whether the applicant is a lender or a broker, or both.

"(c) Upon the filing of the required application and license fee, the commissioner shall investigate the facts and may issue a license if the commissioner finds that the applicant is in all respects properly qualified and of good character and that granting such license would not be against the public interest. Any disapproval of an application by the commissioner shall, when applicable, be subject to the provisions of section 46a-80."

[12] General Statutes § 36a-512 (formerly § 36-224c) provides: "The following are exempt from the licensing requirements of sections 36a-510 to 36a-524,

Our review of the secondary mortgage act indicates that § 36a-511 serves three purposes. First, because licensed lenders are required to comply with the remaining provisions of the secondary mortgage act, which we discuss in more detail later in this opinion, the licensing requirement generally aims to protect consumers by prohibiting certain unscrupulous lending practices. Second, because licensed lenders are subject to this comprehensive scheme of rules, § 36a-511 serves an integral role in the statutory scheme through which the legislature exercises control over the secondary mortgage industry in Connecticut. Third, by expressly

inclusive: (1) Persons licensed as small business investment companies by the Small Business Administration; (2) persons owning real property who take back from the buyer of such property a secondary mortgage loan in lieu of any portion of the purchase price of the property; (3) persons granting secondary mortgage loans to persons related to the lender by blood or marriage; (4) any bank, out-of-state bank, Connecticut credit union, federal credit union or out-of-state credit union, provided subsidiaries of such institutions are not exempt from licensure; (5) persons granting five or fewer secondary mortgage loans within any twelve consecutive months, provided (A) the aggregate total of such loans does not exceed one hundred thousand dollars, (B) each individual loan does not exceed twenty thousand dollars and (C) such loans are written in compliance with section 36a-521; (6) nonprofit corporations granting secondary mortgage loans to promote home ownership or improvements for the disadvantaged; (7) agencies of the federal government or any state or municipal government or any quasi-governmental agency granting secondary mortgage loans under the specific authority of the laws of this state or the United States; (8) persons licensed under sections 36a-555 to 36a-573, inclusive, when making loans authorized by said sections; (9) persons licensed under sections 36a-485 to 36a-498, inclusive, when making loans authorized by said sections, provided such licensed lender makes fewer than twelve secondary mortgage loans within any twelve consecutive months and such loans are written in compliance with section 36a-521; (10) any corporation or its affiliate which makes mortgage loans exclusively for the benefit of its employees or agents; (11) any corporation, licensed in accordance with section 38a-41, or its affiliate or subsidiary, which grants secondary mortgage loans to promote home ownership in urban areas; and (12) persons acting as fiduciaries with respect to any employee pension benefit plan qualified under the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, who make secondary mortgage loans solely to plan participants from plan assets."

authorizing statutory penalties for violations of the licensing requirement, § 36a-511 serves as a deterrent to persons who might otherwise avoid the licensing requirement in order more readily to engage in unscrupulous lending. The enforcement of mortgages taken by unlicensed lenders in foreclosure proceedings would thwart each of these purposes.

The secondary mortgage act places several affirmative obligations on secondary mortgage lenders. For example, General Statutes § 36a-516 (a)[13] requires that each licensee "maintain adequate records of each loan transaction," and that these records be retained for specified periods of time. General Statutes §§ 36a-522[14] and 36a-524,[15] respectively, govern the information

---

[13] General Statutes § 36a-516 (formerly § 36-224g) provides: "(a) Each licensee shall maintain adequate records of each loan transaction. Such records shall provide the following information: (1) A copy of any disclosures required under part III of chapter 669; (2) whether the licensee acted as lender, broker or both; (3) in the case of a licensee acting as a lender, an adequate loan history, itemizing the amount and date of each payment and the unpaid balance at all times; (4) the purpose for which the loan was made; (5) the original or an exact copy of the note, contract or other evidence of indebtedness and the mortgage deed; and (6) the name and address of the broker, if any, involved in the loan transaction.

"(b) Each licensee acting as a lender shall retain records of each loan transaction as required under subsection (a) of this section, for not less than one year from the date of the final payment to the licensee on such loan transaction, or such longer period as may be required by any other provision of law.

"(c) Each licensee acting as a broker shall retain the records required under subsection (a) of this section for not less than two years from the date of the transaction or such longer period as may be required by any other provision of law."

[14] General Statutes § 36a-522 (formerly § 36-224m) provides: "Any mortgage deed to secure a secondary mortgage loan that is recorded in the land records of any town shall contain the word 'Mortgage' in the heading, either in capital letters or underscored, and shall contain the principal amount of the loan."

[15] General Statutes § 36a-524 (formerly § 36-224o) provides: "No person licensed pursuant to section 36a-513 shall advertise or cause to be advertised in any medium, any loan in which it intends to act only as a broker unless the advertisement includes the following statement, clearly and conspicuously expressed: BROKER ONLY, NOT A LENDER."

required in the headings of mortgage deeds securing secondary mortgage loans, and the content of advertisements by persons acting as brokers rather than lenders.

Other provisions prohibit secondary mortgage lenders from engaging in certain activities. For example, General Statutes § 36a-519[16] prohibits a licensee from imposing "any charge as a penalty for the prepayment of principal of a second mortgage loan which exceeds five per cent of the balance prepaid," and prohibits the imposition of any penalty "for any prepayment occurring more than three years after the date of such loan." General Statutes § 36a-521[17] limits the amount

[16] General Statutes § 36a-519 (formerly § 36-224j) provides: "In any transaction subject to part III of chapter 669, no licensee shall impose any charge as a penalty for the prepayment of principal of a second mortgage loan which exceeds five per cent of the balance prepaid, provided no penalty shall be imposed for any prepayment occurring more than three years after the date of such loan."

[17] General Statutes § 36a-521 (formerly § 36-224*l*) provides: "(a) No person engaged in the secondary mortgage loan business in this state as a lender, or a broker, including any licensee under sections 36a-510 to 36a-524, inclusive, and any person who is exempt from licensing under section 36a-512, may (1) charge, impose or cause to be paid, directly or indirectly, as an incident to or a condition of the extension of credit in any secondary mortgage loan transaction, any loan fees, points, commissions, transaction fees or similar prepaid finance charges determined in accordance with sections 36a-675 to 36a-685, inclusive, and regulations adopted thereunder which, when added to any broker's fee or commission for which the borrower may be obligated, exceed in the aggregate eight per cent of the principal amount of the loan or (2) include in the loan agreement upon which loan fees, points, commissions, transaction fees or similar prepaid finance charges have been assessed any provision which permits the lender to demand payment of the entire loan balance prior to the scheduled maturity, except that such loan agreement may contain a provision which permits the lender to demand payment of the entire loan balance if any scheduled instalment is in default for more than sixty days or if any condition of default set forth in the mortgage note exists.

"(b) Any lender who fails to comply with the provisions of this section shall be liable to the borrower in an amount equal to the sum of: (1) The amount by which the total of all loan fees, points, commissions, transaction fees, other prepaid finance charges, and broker's fees and commissions exceeds eight per cent of the principal amount of the loan; (2) eight per cent of the principal amount of the loan or two thousand five hundred

that a licensee can charge for the services related to the secondary mortgage transaction, and prescribes the monetary remedies available to a borrower who is charged in excess of the statutorily authorized amounts. Section 36a-521 (c) also provides that, in the absence of an agreement that meets certain statutorily specified criteria, "every advance fee shall be refundable." In addition, General Statutes § 36a-523[18] prohibits secondary mortgage lenders from accepting applications or

---

dollars, whichever is less; and (3) the costs incurred by the borrower in bringing an action under this section, including reasonable attorney's fees, as determined by the court, provided no such lender shall be liable for more than the amount specified in this subsection in a secondary mortgage loan transaction involving more than one borrower.

"(c) Except as provided in subsection (d) of this section, every advance fee shall be refundable.

"(d) Subsection (c) of this section shall not apply if: (1) The person providing the advance fee and the licensee agree in writing that the advance fee shall not be refundable, in whole or in part; and (2) the written agreement complies in all respects with the provisions of subsection (e) of this section.

"(e) An agreement under subsection (d) of this section shall meet all of the following requirements to be valid and enforceable: (1) The agreement shall be dated, signed by both parties, and be executed prior to the payment of any advance fee; (2) the agreement shall expressly state the total advance fee required to be paid and any amount of the advance fee that shall not be refundable; (3) the agreement shall clearly and conspicuously state any conditions under which the advance fee will be retained by the licensee; (4) the term 'nonrefundable' shall be used to describe each advance fee or portion thereof to which the term is applicable and shall appear in boldface type in the agreement each time it is used; and (5) the form of the agreement shall (A) be separate from any other forms, contracts or applications utilized by the licensee, (B) contain a heading printed in a size equal to at least ten-point boldface type that shall title the form 'AGREEMENT CONCERNING NONREFUNDABILITY OF ADVANCE FEE', (C) provide for a duplicate copy, which shall be given to the person paying the advance fee at the time of payment of the advance fee, and (D) include such other specifications as the commissioner may by regulation prescribe.

"(f) An agreement under subsection (d) of this section that does not meet the requirements of subsection (e) of this section shall be voidable at the election of the person paying the advance fee."

[18] General Statutes § 36a-523 (formerly § 36-224n) provides: "No person engaged in the secondary mortgage loan business in this state as a lender, whether licensed in accordance with the provisions of sections 36a-510 to 36a-524, inclusive, or exempt from licensing, shall accept applications or

referrals from brokers whom the lender knows is operating in violation of the secondary mortgage lender licensing provisions.

The secondary mortgage act also authorizes the commissioner of banking (commissioner) to control the licensing of lenders and to bring injunctive or penal actions against lenders who violate the rules. For example, General Statutes § 36a-517 (a)[19] grants the commissioner the power to "suspend, revoke or refuse to renew any license . . . for any reason which would be sufficient grounds for the commissioner to deny an application . . . or if the commissioner finds that the licensee or any owner, director, officer, member, partner, shareholder, trustee, employee or agent of such licensee," has committed any of a number of specified violations, including fraud or the issuing of any material misrepresentations or misstatements. Section 36a-517 (b) also

referral of applicants from, or pay a fee to, any broker who is required to be licensed under said sections but is not licensed to act as such by the commissioner, if the lender has actual knowledge that the broker is not licensed by the commissioner."

[19] General Statutes § 36a-517 (formerly § 36-224h) provides: "(a) The commissioner may suspend, revoke or refuse to renew any license, in accordance with section 36a-51 for any reason which would be sufficient grounds for the commissioner to deny an application for a license under sections 36a-510 to 36a-524, inclusive, or if the commissioner finds that the licensee or any owner, director, officer, member, partner, shareholder, trustee, employee or agent of such licensee has done any of the following: (1) Made any material misstatement in the application; (2) committed any fraud or misrepresented, concealed, suppressed, intentionally omitted or otherwise intentionally failed to disclose any of the material particulars of any secondary mortgage loan transaction, including disclosures required by part III of chapter 669 or regulations adopted pursuant thereto, to anyone entitled to such information; (3) violated any of the provisions of sections 36a-510 to 36a-524, inclusive, parts I, III and V of chapter 669, sections 46a-65 to 46a-67, inclusive, or section 46a-98, or of any regulations adopted pursuant thereto; or (4) failed to perform a written agreement with a borrower.

"(b) Whenever it appears to the commissioner that any person has violated, is violating or is about to violate any of the provisions of sections 36a-510 to 36a-524, inclusive, the commissioner may take action against such person in accordance with section 36a-50."

permits the commissioner to enforce penalties against a licensee "[w]henever it appears to the commissioner that any person has violated, is violating or is about to violate any of the provisions" of the secondary mortgage act. Moreover, the penalties available to the commissioner for violations of the secondary mortgage act are governed by General Statutes § 36a-50,[20] and are the same as those available for any violation of the banking laws of this state. Pursuant to § 36a-50 (b), the commissioner may, among other things, seek, as against the violator: (1) injunctive relief in the Superior Court; (2) a court order imposing monetary penalties; and (3) a court order mandating that the violator pay restitution.

We next consider the role that the § 36a-511 licensing requirement plays in this comprehensive statutory scheme. The evolution of the secondary mortgage act, as buttressed by the legislative history surrounding the passage of various amendments, affirms that the legislature increasingly has viewed the secondary mortgage

---

[20] General Statutes § 36a-50 (b) provides: "Whenever it appears to the commissioner that any such person has violated, is violating or is about to violate any such provision, regulation, rule or order, the commissioner may, in the commissioner's discretion and in addition to any other remedy authorized by law: (1) Bring an action in the superior court for the judicial district of Hartford to enjoin the acts or practices and to enforce compliance with any such provision, regulation, rule or order. Upon a proper showing, a permanent or temporary injunction, restraining order or writ of mandamus shall be granted and a receiver or conservator may be appointed for such person or such person's assets. The court shall not require the commissioner to post a bond; (2) seek a court order imposing a penalty not to exceed seven thousand five hundred dollars per violation against any such person found to have violated any order issued by the commissioner; or (3) apply to the superior court for the judicial district of Hartford for an order of restitution whereby such person shall be ordered to make restitution of any sums shown by the commissioner to have been obtained by such person in violation of any such provision, regulation, rule or order, plus interest at the rate set forth in section 37-3a. Such restitution shall, at the option of the court, be payable to the receiver or conservator appointed pursuant to this subsection, or directly to the person whose assets were obtained in violation of any such provision, regulation, rule or order. Whenever the commissioner prevails in any action brought under this subsection, the court may allow to the state its costs."

act's licensing requirement as integral to the overall objective of protecting consumers against unscrupulous secondary mortgage lenders.

In 1977, the original act, entitled "An Act Concerning the Regulation of Second Mortgage Lenders," was passed with the stated purpose "[of regulating] the secondary mortgage loan industry to insure that borrowers are protected from dishonest lenders."[21] Raised Committee Bill No. 1390, January Sess. 1977, p. 8. In 1980, as indicated in the legislative history of Public Acts 1980, No. 80-67, the legislature sought to regulate more closely the secondary mortgage industry. The history further indicates that the legislature recognized that a more rigorous licensing scheme would be an effective means of achieving this end. In explaining the proposed bill,[22] Representative John P. Sponheimer stated: "This bill would further regulate the second mortgage industry. It would allow the Banking Commissioner to investigate when a person applies for a second mortgage license. . . . It would allow the Commissioner, if he believes that a second mortgage lender is violating the provisions of the statute, to take . . . action. . . . What this has done is further tighten up a field which

---

[21] The history of the debate surrounding the passage of the bill in 1977 is consistent with this purpose. For example, in remarking on the bill, Representative William J. Scully stated: "Many members of the Banks Committee have been of the opinion that the second mortgage business should be regulated as are other segments of the consumer lending industry. . . . We believe the volume of business is substantial and should be regulated to prevent abuse in the assessment of points, bonuses and discounts in abnormally large amounts. . . . [I]n order to prevent abuses by those who violate the rights of the citizens of this state, we ask your favorable consideration of this bill." 20 H.R. Proc., Pt. 8, 1977 Sess., pp. 2996–97.

[22] The stated purpose of Public Act 80-67 was "[t]o protect consumers from the minority of second mortgage lenders who engage in abusive practices and who are essentially unregulated by adding meaningful regulation to the present law. The present statute requires the banking commissioner to issue a license to any applicant without investigation, yet consumers believe that licensees have been investigated and approved by the state." Raised Committee Bill No. 5734, February Sess. 1980, p. 6.

many people believe needs further regulation. . . . I think this bill is a first step in a tight regulation of this industry, and I move its passage."[23] 23 H.R. Proc., Pt. 3, 1980 Sess., pp. 873–74. Public Act 80-67, § 2, subsequently amended the secondary mortgage act to include what is now § 36a-513 (c),[24] mandating that the commissioner investigate the facts stated in an application for a license and only to "issue a license if the commissioner finds that the applicant is in all respects *properly qualified and of good character* and that granting such license would not be against the public interest. . . ." (Emphasis added.) In 1990, moreover, the legislature again strengthened[25] the licensing provision through No.

[23] Speaking in support of the bill before the Banks Committee, Marsha Goodman, then executive assistant and counsel to the commissioner, stated: "[T]he present law operates as a fraud upon consumers, because in fact, there is no regulation of the second mortgage lending industry or brokering industry as of today. There is a license requirement . . . but that license is absolutely meaningless. We have no authority to investigate any person who applies for a license. We have no authority under the statute to deny a license for any reason, in fact, what we're operating is a license for sale provision. . . . What happens is the consumer goes into the licensee's office, sees this wonderful little license on the wall with the state seal that makes it look as if this person is okay, he's been approved by the state and that consumer has no way of knowing that that person is just entirely unregulated and there's nothing to insure that he's not a fraudulent character." Conn. Joint Standing Committee Hearings, Banks, 1980 Sess., pp. 125–26.

[24] Prior to Public Act 80-67, General Statutes (Rev. to 1979) § 36-224d, now § 36a-513, provided: "(a) An application for a secondary mortgage loan license shall be in writing, under oath and on a form provided by the commissioner.

"(b) The application shall set forth the name and address of the applicant, and, if the applicant is a firm or partnership, the names and address of each member of the firm or partnership and in the case of a corporation the names and address of each officer, director, authorized agent and each stockholder owning ten per cent or more of the outstanding stock of such corporation, or if the applicant is a trust, the name and address of each trustee and each beneficiary of the trust. The application shall also set forth whether the applicant is a lender or a broker, or both."

[25] Speaking in favor of the bill before the Banks Committee, Clarine Nardi-Riddle, then attorney general, stated that the bill "[would] put strong teeth into the licensure requirement by establishing a civil penalty of up to $2000

90-184, § 2, of the 1990 Public Acts, which amended § 36-224b, now § 36a-511 (b), to provide that persons who engage in the secondary mortgage loan business without obtaining the licenses required by the secondary mortgage act would be assessed civil penalties.[26]

Thus, the changes made to what is now § 36a-511 over the past twenty-two years evidence a trend toward strengthening the protection afforded to credit consumers under the secondary mortgage act by making the licensing requirement more rigorous in terms of both the process through which a license is obtained and the penalties available for assessment against violators. Although the legislature did not expressly provide that failure to comply with § 36a-511 will render the secondary mortgage act unenforceable, there is no evidence, either in the text of the statute or in the legislative history surrounding passage of the various amendments, that the legislature intended violators to be subject only to those penalties stated in the secondary mortgage act. On the contrary, a decision that a secondary mortgage loan issued in violation of § 36a-511 is unenforceable would be more consistent with and

for lending or brokering a loan without a license." Conn. Joint Standing Committee Hearings, Banks, 1990 Sess., p. 176.

[26] General Statutes (Rev. to 1991) § 36-224b provided in relevant part: "(b) Any person who engages in the secondary mortgage loan business in this state as a lender or a broker without obtaining the license required under this chapter shall be assessed a civil penalty of not more than two thousand dollars for each violation. Each secondary mortgage loan negotiated, solicited, placed, found or made without a license shall constitute a separate violation. The attorney general may bring an action in superior court to enforce the provisions of this section."

In 1994, No. 94-122, § 241, of the 1994 Public Acts, entitled "An Act Concerning the Reorganization of the Banking Laws of Connecticut," further amended § 36-224b to indicate that violators of the licensing provision of the secondary mortgage act would be subject to the penalty provisions of § 36a-50. See footnote 20 of this opinion. This amendment was one of the many changes included in Public Act 94-122, which was intended to streamline the banking industry in Connecticut. See 37 H.R. Proc., Pt. 8, 1994 Sess., pp. 2803–2808.

would better preserve the protective purpose of the statute.[27]

Moreover, "[i]t is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract . . . . *McMullen* v. *Hoffman*, 174 U.S. 639, 654, [19 S. Ct. 839 (1899)]. *Vaszauskas* v. *Vaszauskas*, 115 Conn. 418, 423, 161 Atl. 856 [1932]. . . . This court has further said that every contract made for or about any matter or thing which is prohibited and made unlawful by statute is a void contract, though the statute does not mention that it shall be so, but only inflicts a penalty on the offender; because a penalty implies a prohibition, though there are no prohibitory words in the statute. *Bartlett* v. *Vinor*, Carthew, 252. *Funk* v. *Gallivan*, 49 Conn. 124, 128 [1881]." (Internal quotation marks omitted.) *Tator* v. *Valden*, 124 Conn. 96, 101–102, 198 A. 169 (1938).

---

[27] Such a conclusion also would be consistent with *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 115, 612 A.2d 1130 (1992). In that case, the lender had violated the Truth in Lending Act (TILA), the Connecticut Unfair Trade Practices Act (CUTPA), and General Statutes (Rev. to 1987) § 36-224*l*, now § 36a-521, the provision of the secondary mortgage act that limits the amount a lender may charge in prepaid finance charges. *Cheshire Mortgage Service, Inc.* v. *Montes*, supra, 82–83. Similar to the case before us, the defendants claimed in their special defenses and counterclaims that the plaintiff's mortgage was unenforceable. Id., 87. Although we did not decide which, if any, of these violations would render the mortgage unenforceable, we remanded the case to the trial court "in order to permit the trial court on the remand to consider the issue of the effect, if any, on the judgment of foreclosure of the remedies flowing from the plaintiff's violation of TILA, CUTPA, and § 36-224*l*." Id., 115. We therefore left open the possibility that a violation of the secondary mortgage act could, at the least, contribute to a finding that the underlying mortgage was unenforceable.

In *G. Nicotera Loan Corp.* v. *Gallagher*, 115 Conn. 102, 106, 160 A. 426 (1932), we considered whether a plaintiff who had violated the provision of the Small Loan Act requiring that a note state the rate of interest charged, could recover the balance owed from the borrower. At the time, although the Small Loan Act expressly provided that a note that charged in excess of 42 percent interest would be unenforceable, it provided only for fines and imprisonment as penalties against lenders who failed to state the rate of interest. Id. Nonetheless, this court reaffirmed the holding of *Westville & Hamden Loan Co.* v. *Pasqual*, 109 Conn. 110, 116–17, 145 A. 758 (1929), rejecting "the claim . . . that provision for a fine and imprisonment was an exclusive penalty and [that] in view of the provisions voiding the loan in specified instances, it could not be held that the note was void for failure to comply with any other provisions of the [Small Loan] Act than those specified." *G. Nicotera Loan Corp.* v. *Gallagher*, supra, 106–107. Relying on *Sagal* v. *Fylar*, 89 Conn. 293, 295, 93 A. 1027 (1915), and *DiBiase* v. *Garnsey*, 103 Conn. 21, 27–28, 130 A. 81 (1925),[28] this court held this claim to be "untenable" stating that "[i]t follows that the trial court was correct in holding that the plaintiff's failure to comply with the [Small Loan] Act in the particulars pointed out, renders the note illegal and void." *G. Nicotera Loan Corp.* v. *Gallagher*, supra, 107.

More recently, in *Barrett Builders* v. *Miller*, 215 Conn. 316, 323–24, 576 A.2d 455 (1990), we concluded

---

[28] In *DiBiase* v. *Garnsey*, supra, 103 Conn. 28, this court held that a repair person could not recover for services rendered in violation of a statute requiring that repair persons obtain the written authority of the owner before performing any car repairs costing in excess of $50. We based this decision on the general principle that illegal contracts are not enforceable, the fact that "the remedial object [of the statute was] apparently in view, and the considerations of public policy . . . ." Id., 27. We determined that to limit the penalties to only those stated in the act "would largely impair its efficiency." Id., 28.

that, although the Home Improvement Act; General Statutes § 20-418 et seq.; does not expressly bar persons who have violated the act from recovering in quasi-contract, the remedial purposes of the statute would be impaired by allowing a contractor who had violated the provisions of General Statutes (Rev. to 1987) § 20-429[29] to recover in quasi-contract. In reaching this decision we stated that "[i]t bears emphasis that the Home Improvement Act was passed for the protection of the public." (Internal quotation marks omitted.) *Barrett Builders* v. *Miller*, supra, 323. The plaintiffs, however, assert that *Barrett Builders* "can be easily distinguished from the present action" because the Home Improvement Act "expressly provides for the invalidation of home improvement contracts made in its violation." Although *Barrett Builders* is distinguishable because of the specific statutory bar noted by the plaintiffs, nonetheless, much of its reasoning supports the defendant's claim in the present case.

Significantly, the court in *Barrett Builders* looked beyond the language of the Home Improvement Act. The majority held that recovery could not be had in quasi-contract even though the language of the act did *not* specifically prohibit restitutionary recovery. Id., 324. Furthermore, the dissent, which focused on the language of the Home Improvement Act and reasoned that "[t]here [was] nothing in the language . . . [to compel] this court to disallow the restitutionary remedies of recovery"; id., 329 (*Shea, J.*, dissenting); stated that, had the contractor instead violated a licensing

---

[29] In *Barrett Builders* v. *Miller*, supra, 215 Conn. 316, it was undisputed that the plaintiff had violated General Statutes (Rev. to 1987) § 20-429, which provided in relevant part: "(a) No home improvement contract shall be valid unless it is in writing and unless it contains the entire agreement between the owner and the contractor. . . .

"(c) The contractor shall provide and deliver to the owner, without charge, a completed copy of the home improvement contract at the time such contract is executed. . . ."

provision, public policy would require disallowing the restitutionary recovery sought. Id., 331 (*Shea, J.,* dissenting). The dissent stated: "It is true that when the purpose of a statute would be defeated by allowing restitution, such a remedy cannot be permitted. The cases from other states cited by the majority, in which contractors were denied any recovery for their work because they had failed to obtain proper licenses, as the home improvement statutes in those states required, illustrate this principle. . . . The purpose of such statutes, to ensure that home improvement work is performed by those having the requisite qualifications, would surely be frustrated if contractors could operate without the licenses required and still obtain, in restitution, the value of the services they perform." (Citations omitted.) Id. (*Shea, J.,* dissenting). Distinguishing the facts before it, the dissent stated: "In the present case we are not concerned with the registration requirements of our Home Improvement Act . . . which are similar to the licensing statutes involved in the cases cited by the majority and thus may be deemed to establish a public policy that would be frustrated by allowing restitution." (Citation omitted.) Id., 332 (*Shea, J.,* dissenting). We read both the majority and the dissenting opinions, therefore, as consistent with the view that, had the contractor violated a statutory licensing requirement, as did the plaintiffs in the present case, any recovery would have been barred.

Relying upon *Sagal* v. *Fylar,* supra, 89 Conn. 293, the plaintiffs also argue that because this court has held that agreements made in contravention of statutes that "[extend] only to the qualification of the party to do business" are not unenforceable, a violation of § 36a-511 should not bar the enforcement of a mortgage contract. In *Sagal,* this court held that a contract made in violation of chapter 277 of the 1911 Public Acts, which prohibited persons from doing business under a trade

name without filing a certificate with the town clerk, was enforceable. Id., 296. In explaining its decision, this court stated that "[t]he contract which furnishe[d] the foundation for this action was one which parties competent to contract might properly enter into. Its purpose was lawful, and the means to be employed lawful. . . . The prohibition of the statute . . . did not extend to the business done or contract made. The contract sued upon was thus in no sense one 'for or about any matter or thing' which was prohibited or made unlawful." Id.

It is true that, in *Sagal*, we described the statute that had been violated as similar to statutes that "[extend] only to the qualification of the party to engage in the business or transaction, or to enter into the contract or undertaking"; id.; in order to distinguish it from the statutes and violations involved in prior cases in which the court subsequently had held the contracts unenforceable. We disagree, however, with the plaintiffs' interpretation of the applicability of this language to the issue presently before us. Similar to our view of this court's decision in *Barrett Builders*, we consider a determination that the secondary mortgage in this case is unenforceable as consistent with, rather than contrary to, this court's decision in *Sagal*.

First, unlike the public act at issue in *Sagal*,[30] which did not place any obligations on those persons operating

[30] Chapter 277 of the 1911 Public Acts provided in pertinent part: "Section 1. No person, except as hereinafter provided, shall, after October 1, 1911, conduct or transact business in this state under any assumed name, or under any designation, name, or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting such business, unless there has been filed in the office of the town clerk in the town in which such business is or is to be conducted or transacted, a certificate stating the name under which such business is or is to be conducted or transacted . . . .

"Sec. 3. Any person conducting or transacting business in violation of the provisions of this act shall be fined not more than five hundred dollars or imprisoned not more than one year."

under assumed names other than the requirement that they register with the town clerk, the licensing requirement of § 36a-511 does "extend to the business done or [the] contract made." Id. As we have explained, persons licensed pursuant to § 36a-511 are subject to the comprehensive set of rules and associated penalties that make up the secondary mortgage act. These rules govern many aspects of a secondary mortgage lender's activities, and thus address considerations far beyond the lender's mere personal qualifications to engage in the secondary mortgage business.

Moreover, the court in *Sagal* also explained that "[i]n cases of this character . . . there is no inflexible rule of arbitrary application for the determination of the effect by implication of the prohibitory statute. *The question is one of legislative intent to be gathered from the language of the statute read in the light of the circumstances with which it deals, the remedial object apparently in view, and such considerations of public policy* as may be involved in the conflicting claims of construction." (Emphasis added.) Id., 296–97. As we have discussed, the enforcement of a contract entered into in violation of § 36a-511 would thwart "the remedial object" of the statute as we have gleaned from the text and legislative history of the secondary mortgage act.

Finally, it is true, as the plaintiffs point out in their brief, that this court has often stated that "[t]he principle that agreements contrary to public policy are [unenforceable] should be applied with caution and only in cases plainly within the reasons on which that doctrine rests . . . ." (Internal quotation marks omitted.) *Williams* v. *Vista Vestra, Inc.*, 178 Conn. 323, 328, 422 A.2d 274 (1979), quoting *Twin City Pipe Line Co.* v. *Harding Glass Co.*, 283 U.S. 353, 356–57, 51 S. Ct. 476, 75 L. Ed. 1112 (1931). We disagree, however, that this principle requires the enforcement of the mortgage at issue in the present case. Rather, we view the public policy

concerns that are implicated by violations of § 36a-511 as sufficient to warrant the determination that mortgages taken by lenders in violation of this provision are unenforceable.[31]

In reaching this conclusion, we join several of our sister states that similarly have held that loan contracts issued by moneylenders or creditors in violation of statutory licensing requirements are not enforceable, even though the applicable statutes did not expressly so provide. See, e.g., *Derico* v. *Duncan*, 410 So. 2d 27, 31 (Ala. 1982) (violation of licensing provision of consumer loan statute);[32] *Levinson* v. *Boas*, 150 Cal. 185, 193–94, 88 P. 825 (1907) (violation of licensing provision of pawnbroking statute); annot., 29 A.L.R.4th 884 (1984) (listing cases in which courts have barred enforcement of contracts entered into by unlicensed lenders or creditors in absence of statute that explicitly provided that violation of licensing provision would render contracts unenforceable). Moreover, several jurisdictions "have taken

---

[31] We also reject the plaintiffs' argument that, because the "Defendant[s] had failed to pay principal and interest for some time on a valid loan with the Plaintiffs, had failed to pay the property taxes and [were] delinquent on the homeowners insurance premiums," they came to the court with "unclean hands" and are thereby precluded from asking the court's assistance in defending against the foreclosure, an equitable proceeding. We have stated that "the equitable maxim that he who comes into equity must come with clean hands . . . should be applied . . . to promote public policy and the integrity of the courts, and is not one of absolutes." (Citations omitted; internal quotation marks omitted.) *DeCecco* v. *Beach*, 174 Conn. 29, 34–35, 381 A.2d 543 (1977). We believe that the public policy concerns implicated by the question of the enforceability of this mortgage loan render the "unclean hands" doctrine inapplicable. We therefore do not decide whether the defendants in the present case actually did come to the court with unclean hands.

[32] In 1990, Alabama amended its code to provide that an agreement entered into in violation of the licensing provision that had been violated in *Derico* v. *Duncan*, supra, 410 So. 2d 27, "shall not be void" and that "any creditor who fails to comply with any requirement imposed under this [consumer finance] chapter with respect to any person is liable to the person only for the actual economic damages sustained by the person as the result of the failure. . . ." Ala. Code § 5-19-19 (c) (1996).

the position that generally unlicensed artisans or contractors cannot recover on the contract for services rendered even though the relevant licensing statute contained no express provision relating to the enforceability of contracts of unlicensed contractors or artisans." Annot., 44 A.L.R.4th 271, 318 (1986); id., 318–19 (listing cases from twelve jurisdictions); id., 13 (Sup. 1998) (listing additional cases from three of twelve jurisdictions and listing additional cases from two additional jurisdictions); see, e.g., *Billes* v. *Bailey*, 555 A.2d 460 (D.C. 1989) (home improvement contractor); *Harry Berenter, Inc.* v. *Berman*, 258 Md. 290, 265 A.2d 759 (1970) (same); *Chosen Construction Corp.* v. *Syz*, 138 App. Div. 2d 284, 525 N.Y.S.2d 848 (1988) (same).

Our conclusion is also consistent with the decisions of those states that follow "the well-established rule that if the purpose of a licensing statute is the regulation of the business licensed and not merely the collection of revenue, a person not licensed cannot enforce a contract for services rendered within the scope of the regulated business." *Tucker* v. *Walker*, 293 Ala. 589, 592, 308 So. 2d 245 (1975); see *Harry Berenter, Inc.* v. *Berman*, supra, 258 Md. 293; *Hastings Associates, Inc.* v. *Local 369 Building Fund, Inc.*, 42 Mass. App. 162, 177, 675 N.E.2d 403, review denied, 424 Mass. 1108, 678 N.E.2d 1334 (1997); see also 2 Restatement (Second), Contracts § 181 (1981) ("[i]f a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if [a] the requirement has a regulatory purpose, and [b] the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement").

To the extent that our conclusion might be viewed as allowing the defendants to receive a windfall at the

expense of the plaintiffs, we note that this result is common, and, as we previously have determined, necessary in many cases in which contracts are deemed unenforceable on the grounds of furthering overriding public policies. See *Barrett Builders* v. *Miller*, supra, 215 Conn. 323–24 (no recovery in quasi-contract for goods and services provided in violation of Home Improvement Act); *G. Nicotera Loan Corp.* v. *Gallagher*, supra, 115 Conn. 106–107 (no recovery on note that did not state rate of interest and amount of loan as required under Small Loan Act); *DiBiase* v. *Garnsey*, supra, 103 Conn. 28 (no recovery for repair persons who violate statute requiring written authority to perform automobile repairs in excess of $50).

The judgment of the Appellate Court is reversed with respect to the foreclosure and the case is remanded to that court with direction to reverse the judgment of the trial court on that issue, and to direct that judgment be rendered for the defendants on the complaint for foreclosure of the mortgage.

In this opinion the other justices concurred.