**WHEELABRATOR ENVIRONMENTAL SYSTEMS, INC.,** Plaintiff,

v.

**James E. GALANTE, Greensphere, Inc., Transfer Systems, Inc., and Automated Waste Disposal, Inc. Defendants.**

**No. CIV. 3:97CV01040 AVC.**

United States District Court, D. Connecticut.

March 29, 2001.

Paul D. Sanson, Kathleen M. LaManna, Shipman & Goodwin, Hartford, CT, J. Anthony Downs, Michael K. Murray, Andrew R. Levin, Christopher Moore, Goodwin, Procter & Hoar, Boston, MA, for Plaintiff.

Reed D. Rubinstein, Pepe & Hazard, Southport, CT, for Defendants.

### RULING ON CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

COVELLO, Chief Judge.

This is an action for damages and injunctive relief brought pursuant to common law tenets concerning breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with a contractual relationship, tortious interference with a business expectancy, fraud, and civil conspiracy. On January 12, 1998, the defendants filed a

second set of amended counterclaims. On March 1, 2000, the court rendered judgment in favor of the plaintiff, Wheelabrator Environmental Systems, Inc. ("Wheelabrator"), as to all of the defendants' counterclaims except the eighth counterclaim. In its eighth counterclaim, the defendant, Greensphere, Inc. ("Greensphere"), seeks a declaration that the contract at issue in this action is unenforceable.

Wheelabrator and Greensphere now each move, pursuant to Federal Rules of Civil Procedure 56, for partial summary judgment as to liability only as to the first count of the complaint, alleging breach of contract, and Greensphere's eighth counterclaim.

The issues presented are: 1) whether the United States Supreme Court decision in *C & A Carbone v. Town of Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), constituted a "Force Majeure Event" or a "Change of Law" under the contract, rendering the contract "unenforceable by its own terms"; 2) whether the contract is "void as against public policy"; 3) whether Greensphere is excused from its performance obligations under the contract under the doctrine of mutual mistake; 4) whether Greensphere is excused from its performance obligations under the contract under the doctrine of frustration of purpose; and 5) whether either Wheelabrator or Greensphere are entitled to summary judgment as to count one of the complaint. For the following reasons, the court concludes each of these issues in the negative. Accordingly, Wheelabrator's motion for partial summary judgment is granted in part and denied in part, and Greensphere's motion for partial summary judgment is denied.

## FACTS

Examination of the complaint, answer and second amended counterclaims, affidavits, exhibits, supplemental materials and the Rule 9(c) statements of material fact accompanying the motions for summary judgment, and the responses thereto, discloses the following undisputed, material facts:

The within cross-motions for partial summary judgment concern a certain contract, dated April 14, 1993, by and between Wheelabrator and Greensphere, for waste collection and transfer services by Greensphere (the "Greensphere Contract"). However, a discussion of the material facts concerning other contracts that relate to the Greensphere Contract and the circumstances under which the Greensphere Contract was entered into are required to dispose of the within motions.

### The HRRA and the WSDA

The Housatonic Resources Recovery Authority ("HRRA"), a regional resources recovery authority created pursuant to Chapter 103b of the Connecticut General Statutes, §§ 7–273aa *et seq.,* consists of eleven member municipalities [1] in the Danbury, Connecticut area (the "Member" or "Participating Municipalities") which have joined together to arrange for the orderly disposal of municipal solid waste ("MSW") in accordance with state and regional solid waste plans.[2]

1. The eleven Connecticut member municipalities are Bethel, Bridgewater, Brookfield, Danbury, Kent, New Fairfield, New Milford, Newton, Redding, Ridgefield, and Sherman.

2. Connecticut General Statute section 22a–220(a) requires each Connecticut municipality to "make provisions for the safe and sanitary disposal of all solid wastes which are generated within its boundaries." Connecticut General Statute section 22a–220(g) authorizes Connecticut municipalities to "contract with a municipal authority, another municipality, a regional entity, the Connecticut Resources Recovery Authority, a nonprofit organization,

The plaintiff, Wheelabrator Environmental Systems, Inc. ("Wheelabrator"), is a Delaware corporation that operates waste-to-energy resource recovery facilities in Connecticut.

On or about October 23, 1991, Wheelabrator entered into a waste supply and disposal agreement ("WSDA") with the HRRA. The HRRA entered into the WSDA because it was "desirous of securing a long-term disposal option for all or portions of the Acceptable Waste generated within the member municipalities." The WSDA defines "Acceptable Waste" as "all household garbage . . . now normally or which may be hereinafter collected and disposed of by or on behalf of the HRRA, but excluding" certain hazardous waste, large items of waste, and various other specific types of waste.

Pursuant to the WSDA, the HRRA agreed to deliver "all of its Acceptable Waste" to Wheelabrator's resource recovery facilities, or to one of four "transfer stations" to be operated and maintained by Wheelabrator. The HRRA further agreed to deliver a minimum "Guaranteed Annual Tonnage" of HRRA Acceptable Waste to Wheelabrator each year.

For its part, Wheelabrator agreed to accept "all quantities of HRRA Acceptable Waste delivered by or caused to be delivered by the HRRA."[3] Wheelabrator also agreed to make available to the HRRA four transfer stations for the receipt, processing and transfer of "HRRA Acceptable Waste" from the Member Municipalities to Wheelabrator's resource recovery facilities. Wheelabrator further agreed that one of these transfer stations would be located in Danbury, Connecticut, and that it would operate the Danbury transfer station, either directly or through a contractor, so as "to guarantee a capability of receiving, handling and hauling to [Wheelabrator's resource recovery] [f]acilities all HRRA Acceptable Waste received from the Participating Municipalities."

### The HRRA and the MWDAs

In connection with the waste disposal system provided for under the WSDA (the "WSDA system"), the HRRA entered into a municipal waste disposal agreement (the "MWDAs") with each of its Member Municipalities. These MWDAs require each Member Municipality to "deliver or cause to be delivered" a minimum annual tonnage of "Acceptable Waste" to the WSDA system.[4] The MWDAs further require the Member Municipalities to "take all steps legally within [their] power to assure that" they satisfy their obligation to deliver the minimum tonnage of Acceptable Waste to the WSDA system, and specifically require the municipalities to "enact and enforce in a reasonable manner an ordinance or other legally enforceable instrument directing that all Acceptable Waste generated within its boundaries be delivered to the" WSDA system. The MWDAs provide that the

a private contractor or any combination thereof for assistance in complying" with its statutory waste disposal obligations.

**3.** The WSDA defines "HRRA Acceptable Waste" as "Acceptable Waste generated within the Participating Municipalities for which the HRRA currently or hereafter assumes responsibility for disposal." The WSDA further defines "Participating Municipality" as "that municipal member of the HRRA which will supply its waste to be disposed of by [Wheelabrator] pursuant to this Agreement and the

[respective] Municipal Waste Disposal Agreement" entered into between the HRRA and the respective municipality.

**4.** Similar to the WSDA, the MWDAs define "Acceptable Waste" as "all household garbage . . . now normally or which may be hereinafter collected and disposed of by or on behalf of the Municipality, but excluding" certain hazardous waste, large items of waste, and various other specific types of waste.

Member Municipalities "may license or contract with one or more [waste] [c]ollectors to satisfy" its obligation to deliver Acceptable Waste to the WSDA system.

In order to ensure that its Acceptable Waste was delivered to Wheelabrator pursuant to the WSDA and the MWDAs, each Member Municipality enacted so-called "flow control ordinances," which required private waste haulers that collected waste within the respective municipality's borders to deliver such waste to a designated transfer station or disposal facility.

### Greensphere and the Greensphere (Transfer Station) Contract

The defendants, Greensphere, Inc. ("Greensphere") and Transfer Systems, Inc. ("TSI"), are Connecticut corporations involved in the business of hauling and transferring waste within the state of Connecticut. The defendant, James E. Galante, is an officer, director and majority shareholder of Greensphere and TSI.

Greensphere is the owner and operator of a transfer station located in Danbury, Connecticut (the "Transfer Station"). On or about April 14, 1993, Wheelabrator entered into the contract at issue in the within motions, i.e., the Greensphere Contract, the "core purpose" of which was to secure the use of the Transfer Station for the receipt, processing and "transfer of HRRA Acceptable Waste pursuant to . . . the WSDA."[5] In the Greensphere Contract, Greensphere agreed to "staff, equip and maintain the Transfer Station in such a manner as to guarantee a capability of handling and hauling to [Wheelabrator's resource recovery facilities] all Acceptable Waste delivered to the Transfer Station on behalf of or by the HRRA or a Participating Municipality." Greensphere also

agreed to accept "all HRRA Acceptable Waste delivered to the Transfer Station and transport[ ] . . . all such Acceptable Waste to" Wheelabrator's resource recovery facilities. Greensphere further agreed to "utilize, maintain and operate motor truck scales to weigh all vehicles delivering Acceptable Waste to the Transfer Station."

At all times relevant, TSI operated its own waste transfer operation on the property on which the Transfer Station was located (the "Transfer Station site"). The Greensphere Contract does not impose any duty on TSI to accept and/or transfer to Wheelabrator any Acceptable Waste in accordance with the terms of the Greensphere Contract. In the Greensphere Contract, Wheelabrator acknowledged that "the Transfer Station [would] be used by [Greensphere] for the receipt and transfer of waste other than HRRA Acceptable Waste." Greensphere agreed to "insure that any Acceptable Waste delivered by or on behalf of the HRRA [was] not commingled with, and [was] handled separately from, waste delivered by or on behalf of any other entity." Greensphere also agreed to "not knowingly accept or agree to accept for processing at the Transfer Station any Acceptable Waste generated within any Participating Municipality except as provided for in the [Greensphere Contract]."

For its part, Wheelabrator agreed to pay Greensphere a certain price per ton, pursuant to a schedule of prices adjusted annually for escalation, for all "Acceptable Waste transferred through the Transfer Station to a [Wheelabrator resource recovery] [f]acility."

---

**5.** The Greensphere Contract, like the WSDA, defines "Acceptable Waste" as "all household garbage . . . now normally or which may be hereinafter collected and disposed of by or on behalf of the HRRA, but excluding" certain hazardous waste, large items of waste, and various other specific types of waste.

The Greensphere Contract provides that "[n]either party to [the contract] shall be liable to the other party for a failure or delay in performance hereunder due to the occurrence of a Force Majeure Event ...." The Greensphere Contract defines a Force Majeure Event as "any event or condition having, or which may reasonably be expected to have, a material adverse effect on [Wheelabrator] or [Greensphere], or on [Wheelabrator's] or [Greensphere's] ability to perform pursuant to [the contract]." The Greensphere Contract further states that such an event or condition may include a "Change of Law," which the contract defines as including the "modification or official change in interpretation after the date [of the contract] of any federal, state or local law, regulation, rule, requirement, ruling or ordinance" or a "court order and/or judgment" "having, or which may reasonably be expected to have, a material adverse effect on [Wheelabrator] or [Greensphere], or on [Wheelabrator's] or [Greensphere's] ability to perform pursuant to [the contract]."

### Waste Disposal Before and After C & A Carbone v. Town of Clarkstown

Between 1993 and January 1997, Greensphere and Wheelabrator each continued to perform their obligations under the Greensphere Contract and to receive the benefits of the Greensphere Contract. During this period, Greensphere received Acceptable Waste at the Transfer Station and transferred this waste to Wheelabrator pursuant to the terms of the Greensphere Contract.

On May 16, 1994, in *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the United States Supreme Court invalidated a so-called "flow control" ordinance, that is, a municipal ordinance which required all MSW to be processed at a designated local transfer station before it was shipped outside of the borders of the municipality. *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 386–89, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

After *Carbone* was decided, "HRRA did not compel [private waste] haulers operating in the HRRA" Member Municipalities, by ordinance or otherwise, to deliver waste to Wheelabrator on behalf of the HRRA. Also after *Carbone* was decided, Greensphere continued to deliver at least some Acceptable Waste to Wheelabrator pursuant to the terms of the Greensphere Contract. "[I]n the twelve month periods ending June 30, 2000, the Transfer Station ... processed and shipped to [Wheelabrator] on average more than 1,000 tons of Acceptable Waste *per month*." Greensphere continues in its ability to accept, process and deliver to Wheelabrator "as much tonnage of [Acceptable Waste] as is available" to it.

### STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992)(quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v.*

*Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

■ In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *see D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). "The non-moving party . . . must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R.Civ.P. 56. "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." *Zigmund v. Foster*, 106 F.Supp.2d 352, 356 (D.Conn. 2000) (citations and quotation marks omitted). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to avoid the entry of judgment against the non-moving party]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION

### I. *Greensphere's Counterclaim—Validity of the Greensphere Contract*

■ In its eighth counterclaim, Greensphere seeks a declaration that "[t]he Greensphere Contract is unenforceable by its own terms, due to the change in law relating to the legality of flow control [as a result of *Carbone* ], and [that the Greensphere Contract is] otherwise void as against public policy." Both Wheelabrator and Greensphere now move for partial summary judgment as to Greensphere's counterclaim, each arguing that there are no genuine issues of material fact as to whether or not the Greensphere Contract is valid and that they are, respectively, entitled to a judgment as a matter of law.

### A. "Change of Law" Under the Express Terms of the Greensphere Contract

Wheelabrator first argues that it is entitled to judgment in its favor as to Greensphere's counterclaim because Greensphere has failed to show that *Carbone* constituted a "Force Majeure Event" or a "Change of Law," render[ing] the Greensphere Contract "unenforceable by its own terms." Specifically, Wheelabrator argues that Greensphere has offered no evidence to support its contention that the *Carbone* decision had a "material adverse effect" on Greensphere, or on Greensphere's "ability to perform pursuant to [the Greensphere Contract]," and thus, Greensphere is not excused from its obligations under the Greensphere Contract.

Greensphere responds that *Carbone* did constitute a "Force Majeure Event" as defined by the express terms of the Greensphere Contract, and thus, it is excused from performing its obligations under the Greensphere Contract. Specifically, Greensphere argues that *Carbone* had a "material adverse effect" on Greensphere in that after *Carbone*, "many [of] the waste haulers collecting trash in HRRA communities . . . by-passed Greensphere" and delivered trash to other facilities, that it "suffered significantly" from this diversion, and that it therefore has "no business reason to exist."

The Greensphere Contract states that "[n]either [Wheelabrator or Greensphere] shall be liable to the other . . . for a failure . . . in performance hereunder due to the

occurrence of a Force Majeure Event." The Greensphere Contract further defines a "Force Majeure Event" as an event or condition which has "a material adverse effect on [Wheelabrator] or [Greensphere], or on [Wheelabrator's] or [Greensphere's] ability to perform pursuant to [the Greensphere Contract]." The Greensphere Contract further states that such an event or condition may include a "Change of Law," which the Greensphere Contract defines as including a "court order and/or judgment" "having, or which may reasonably be expected to have, a material adverse effect on [Wheelabrator] or [Greensphere], or on [Wheelabrator's] or [Greensphere's] ability to perform pursuant to [the Greensphere Contract]." The Greensphere Contract does not further define the meaning of "material adverse effect," and the parties offer no definition in their respective memoranda.

Upon a review of the submissions by Greensphere, the court concludes that Greensphere has offered no evidence to support its contention that *Carbone* is a "Force Majeure Event" as defined by the express terms of the Greensphere Contract. Specifically, Greensphere has offered no evidence supporting its assertion that *Carbone* had a "materially adverse effect" on Greensphere, or on Greensphere's "ability to perform" pursuant to the Greensphere Contract. Greensphere admits that at all relevant times it has had the ability to perform its obligations under the Greensphere Contract. In fact, to date, Greensphere continues to deliver at least some Acceptable Waste to Wheelabrator pursuant to the terms of the Greensphere Contract. "[I]n the twelve month periods ending June 30, 2000, the Transfer Station has processed and shipped to [Wheelabrator] on average more than 1,000 tons of Acceptable Waste *per month*." Greensphere has offered only the conclusory allegation that it "suffered

significantly" from the diversion of some Acceptable Waste from Greensphere to its competitors allegedly caused by *Carbone*.

For the foregoing reasons, the court concludes that Greensphere has failed to raise a genuine issue of material fact to support its argument that *Carbone* constituted a "Force Majeure Event" or a "Change of Law" which rendered the Greensphere Contract "unenforceable by its own terms."

### B. Void as Against Public Policy

■ Wheelabrator next argues that it is entitled to judgment in its favor as to Greensphere's counterclaim because the Greensphere Contract is not "otherwise void as against public policy." Specifically, Wheelabrator argues that "*Carbone* has no application to the [Greensphere Contract], or to the underlying WSDA, both of which are contractual agreements for the disposal of waste," because *Carbone* only forbids "*state regulation* that impermissibly discriminate[s] against interstate commerce." Wheelabrator further argues the Greensphere Contract does not violate public policy as an "instrumentality of the [allegedly] illegal WSDA" because the HRRA Member Municipalities' "decisions to act as participants' in the market for waste disposal services by entering into the WSDA does not constitute 'regulation' for purposes of [determining whether the WSDA violates] the Commerce Clause."

Greensphere responds that the Greensphere Contract is void and unenforceable because, "as an instrumentality of the illegal WSDA, [it] violates public policy." Specifically, Greensphere argues that the Greensphere Contract "was designed to promote and foster [the WSDA's] trash disposal scheme," and that this scheme "was illegal because it was based on illegal municipal ordinance flow control," i.e., or-

dinances that "relied on the exercise of the local police power to impermissibly restrain interstate commerce."

■ "[I]t is well established that contracts that violate public policy are unenforceable." *Solomon v. Gilmore*, 248 Conn. 769, 774, 731 A.2d 280 (1999). "[N]o court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law." *Solomon v. Gilmore*, 248 Conn. 769, 785, 731 A.2d 280 (1999) (citations and internal quotation marks omitted); *see Dowling v. Slotnik*, 244 Conn. 781, 807–08, 712 A.2d 396 (1998). However, "it is the general rule . . . that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts" unless a violation of the law or public policy is "clear and certain." *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 376–77, 321 A.2d 444 (1973) (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356–57, 51 S.Ct. 476, 75 L.Ed. 1112 (1931)).

■ "The Supreme Court . . . has long interpreted the Commerce Clause . . . as a restriction on permissible state regulation." *SSC Corp. v. Smithtown*, 66 F.3d 502, 508 (2d Cir.1995) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)); *see Fulton Corp. v. Faulkner*, 516 U.S. 325, 330, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996). "The Commerce Clause only . . . withholds from the states . . . the power to '*regulate* Commerce . . . among the several States.' Because the power conferred by the Constitution is the power to 'regulate,' the strictures of the dormant Commerce Clause are not activated unless a *state* action may be characterized as a *regulation*." *SSC Corp. v. Smithtown*, 66 F.3d 502, 510 (2d Cir.1995) (emphases added).

In *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the United States Supreme Court invalidated a so-called "flow control" ordinance, that is, a municipal ordinance which required all MSW to be processed at a designated local transfer station before it was shipped outside of the borders of the municipality. *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 386–89, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The Court held that "[s]tate and local governments may not use their *regulatory* power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 394, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (emphasis added). Specifically, the Court held that the flow control ordinance at issue in that case discriminated against interstate commerce in violation of the Commerce Clause in that it "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred [local] processing facility" and that the municipality had "other means to advance [its] legitimate local interest" for which the ordinance was allegedly passed. *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392–93, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

■ However, "flow control" of MSW by a municipality does not violate the commerce clause if the municipality does so "without resorting to its *police* powers . . . as a market *regulator*," but "participates in the waste disposal market" as a buyer of collection, disposal and incineration services. *SSC Corp. v. Smithtown*, 66 F.3d 502, 514, 516–17 (2d Cir.1995) (emphases added). For example, in *SSC Corp. v. Smithtown*, 66 F.3d 502 (2d Cir.1995), the Second Circuit held that a municipal flow control *ordinance* which required all garbage generated within the defendant mu-

nicipality's borders to be disposed of at a particular incinerator, violated the Commerce Clause because it impermissibly discriminated against interstate commerce. *SSC Corp. v. Smithtown*, 66 F.3d 502, 506 (2d Cir.1995). However, in the same decision, the Second Circuit held that the defendant municipality's *contract* with private garbage haulers, which contract required those haulers to collect all residential garbage generated within the defendant municipality's borders, and to deliver all such garbage to the same incinerator, did not violate the Commerce Clause. *SSC Corp. v. Smithtown*, 66 F.3d 502, 505–06 (2d Cir.1995). The court held that the *contract* "constitute[d] municipal participation in both the waste collection and disposal markets, and [was] thus free from the strictures of the Commerce Clause." *SSC Corp. v. Smithtown*, 66 F.3d 502, 506 (2d Cir.1995). Similarly, in *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.3d 59 (2d Cir.1998), the Second Circuit held that "long-term waste disposal *contracts* that [the Connecticut Resource Recovery Authority] negotiated with Connecticut municipalities as a vendor of waste disposal services," whereby the municipalities committed to dispose their respective waste at a particular facility, were "clearly market participation" that did not offend the Commerce Clause. *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 78 (2d Cir.1998) (emphasis added).

Here, the "core purpose of the [Greensphere Contract]" is to allow Wheelabrator to satisfy its obligation under the WSDA to provide "the HRRA and its Participating Municipalities [a transfer station facility in Danbury through which the municipalities may] transfer Acceptable Waste"

to Wheelabrator. In the WSDA, the HRRA agreed to "deliver or cause to be delivered to the Transfer Station" all of the "Acceptable Waste" generated within the Participating Municipalities. However, the WSDA does not specify how the HRRA, or the Participating Municipalities, must ensure this "flow" of Acceptable Waste to the Transfer Station. More importantly, the WSDA does not require the Participating Municipalities to use their police power to enact and enforce flow control ordinances to do so. Because, under the terms of the WSDA, the Participating Municipalities may control the flow of Acceptable Waste "without resorting to its *police* powers as a market *regulator*," by entering into waste disposal contracts with trash haulers as a "market participant," it is not "clear and certain" that the WSDA offends the Commerce Clause. *SSC Corp. v. Smithtown*, 66 F.3d 502, 514, 516–17 (2d Cir.1995); *see Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 78 (2d Cir.1998); *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 376–77, 321 A.2d 444 (1973).

In the MWDAs, entered into between the HRRA and its Participating Municipalities, the Participating Municipalities agreed to "deliver or cause to be delivered" their Acceptable Waste pursuant to the WSDA. To this end, the Participating Municipalities further agreed to "enact and enforce in a reasonable manner an ordinance *or other legally enforceable instrument* directing that all Acceptable Waste generated within its boundaries be delivered" pursuant to the WSDA. (emphasis added). To satisfy their obligations under the MWDAs, the Participating Municipalities enacted flow control ordinances which, in light of *Carbone*, may (or may not) now violate the Commerce Clause.[6] Although

---

6. The court was not presented with sufficient evidence to determine whether the flow control ordinances enacted by the Participating Municipalities' violate the Commerce Clause.

it is unclear whether these ordinances remain in effect, it is undisputed that the Participating Municipalities ceased enforcing the ordinances after *Carbone* was decided.

Despite the Participating Municipalities' respective decisions to enact flow control ordinances to satisfy their obligations under the MWDAs and the WSDA system, the MWDAs do not *require* the municipalities to enact such ordinances. Specifically, the MWDAs provide that the Participating Municipalities may, instead of enacting such ordinances, enact any "other legally enforceable instrument" in order to direct the flow of Acceptable Waste. The MWDAs specifically provide that the Member Municipalities "may license or contract with one or more [waste] [c]ollectors to satisfy" its obligation to deliver Acceptable Waste to the WSDA system. Because, under the terms of the MWDAs, the Participating Municipalities may control the flow of Acceptable Waste "without resorting to its *police* powers [and enacting flow control ordinances] as a market *regulator*," by entering into waste disposal contracts with trash haulers as a "market participant," it is not "clear and certain" that the MWDAs offend the Commerce Clause. *SSC Corp. v. Smithtown*, 66 F.3d 502, 514, 516–17 (2d Cir.1995); *see Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 78 (2d Cir.1998); *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 376–77, 321 A.2d 444 (1973).

In light of the foregoing, the court concludes that it is not "clear and certain" that the WSDA's "trash disposal scheme" is illegal or violates public policy, and therefore, the Greensphere Contract is not void as a matter of public policy. *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 376–77, 321 A.2d 444 (1973).

## C. Mutual Mistake [7]

■ Greensphere next argues that it is entitled to judgment in its favor as to its counterclaim "because of the parties' mutual mistake as to the status of flow control." Specifically, Greensphere argues that "HRRA flow control was a material basis for the parties' bargain" under the Greensphere Contract, and that "both parties mistakenly assumed the flow control system set forth in the WSDA was legal ... and would remain in place for the entire term" of the Greensphere Contract.

Wheelabrator responds that the doctrine of mutual mistake is inapplicable under the circumstances here, because Greensphere does not contend that the Greensphere Contract "fails to express the real agreement" between the parties. Wheelabrator further argues that "[t]he WSDA does not 'presume' the existence of 'flow control,'" and that the "HRRA's contractual obligation to deliver all of its Acceptable Waste to [Wheelabrator] is entirely independent of its agreement to use its best efforts' to cause its member towns to enact so-called 'flow control' ordinances."

■ "Rescission of a contract on the ground of mutual mistake may be granted in a proper case where the mistake is common to both parties and by reason of it each has done what neither intended." *Buol Machine Co. v. Buckens*, 146 Conn. 639, 641, 153 A.2d 826 (1959); *Inland Wetlands & Watercourses Agency v. Landmark Investment Group, Inc.*, 218 Conn. 703, 708, 590 A.2d 968 (1991). "Whether

---

However, the court need not reach this issue to dispose of the within motions.

7. Greensphere did not raise this defense to the validity of the Greensphere Contract, or the defense of frustration of purpose, discussed *infra*, in its answer and counterclaims, but raises these defenses in its summary judgment memoranda for the first time.

there has been such mistake is a question of fact." *Id.* "To justify rescission of a contract, however, a mistake must be of an existing or past fact. Mistakes in predicting the future, understandably, cannot form the basis for rescinding a contract." *Wooldridge v. Exxon Corp.*, 39 Conn.Supp. 190, 192, 473 A.2d 1254 (Conn.Super.Ct.1984) (citations omitted). "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake]." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202–03 (Fed.Cir.1994) (quoting Restatement (Second) of Contracts § 151 cmt. a (1981)) (citing cases).

Here, Greensphere asserts that the mutual "mistake" was the assumption that "the flow control system set forth in the WSDA was legal ... and would remain in place for the entire term" of the Greensphere Contract. However, as already discussed above, there is no evidence that the "flow control system" contemplated under the WSDA is illegal. The WSDA does not specify how the HRRA must ensure that their Acceptable Waste is delivered to the Transfer Station, or require the Participating Municipalities to pass and enforce flow control ordinances to do so. Further, the WSDA does not preclude the Participating Municipalities from entering into "long-term waste disposal contracts" with private haulers, requiring those haulers to deliver their Acceptable Waste to the Transfer Station.

Furthermore, even if the "flow control system" contemplated under the WSDA required ordinance flow control, Greensphere may not raise the defense of mistake based upon a mistake that a flow control system, presumably legal at the time of contracting, would remain legal under subsequent case law. *See Wooldridge v. Exxon Corp.*, 39 Conn.Supp. 190,

192, 473 A.2d 1254 (Conn.Super.Ct.1984) ("[A] mistake must be of an existing or past fact ... [not a mistake in] predicting the future."). Greensphere does not argue that ordinance flow control was illegal at the time it entered into the Greensphere Contract. The decision which Greensphere contends resulted in the changed circumstances here, *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), was decided in May 1994, over one year *after* Wheelabrator and Greensphere entered into the Greensphere Contract.

In light of the foregoing, the court concludes that the Greensphere Contract is not rendered unenforceable due to a mutual mistake as to the status of flow control.

**D. Frustration of Purpose**

■ Greensphere finally argues that it is entitled to judgment in its favor as to its counterclaim because the purpose of the Greensphere Contract was frustrated by *Carbone.* Specifically, Greensphere argues that its "fundamental purpose" in contracting with Wheelabrator was to "servic[e] a flow-controlled market" and that "*Carbone* was the supervening event that substantially frustrated" this purpose. Greensphere further argues that "[t]he existence of flow control was a basic assumption on which the [Greensphere Contract] was made" and that after "*Carbone* struck down ordinance flow control ... neither HRRA nor the participating towns mandated hauler delivery of trash 'on (HRRA's) behalf' to Greensphere."

Wheelabrator responds that the doctrine of frustration of purpose is inapplicable under the circumstances here. Specifically, Wheelabrator argues that the objectives of the Greensphere Contract are for Greensphere to "accept[ ] all HRRA Acceptable Waste delivered to the Transfer Station," to "transport[ ] all such Accept-

able Waste to [Wheelabrator]," and to not "knowingly accept . . . at the Transfer Station any Acceptable Waste . . . except as provided for in [the Greensphere Contract]," and that these objectives are not "utterly defeated" by *Carbone.*

 "The doctrine of frustration of purpose . . . excuses a promisor [from its obligations under a contract] in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement." *Hess v. Dumouchel Paper Co.,* 154 Conn. 343, 350–51, 225 A.2d 797 (1966). "A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that ∴ . the event substantially frustrated his principal purpose [and that] the nonoccurrence of the supervening event was a basic assumption on which the contract was made . . . ." *O'Hara v. Connecticut,* 218 Conn. 628, 638 n. 7, 590 A.2d 948 (1991) (citing Restatement (Second), Contracts § 265). "[T]he event upon which the obligor relies to excuse his performance cannot be an event that the parties foresaw at the time of the contract." *O'Hara v. Connecticut,* 218 Conn. 628, 638, 590 A.2d 948 (1991).[8]

Here, Greensphere has failed to show that the objectives of the Greensphere Contract have been "utterly defeated" by *Carbone. See Hess v. Dumouchel Paper Co.,* 154 Conn. 343, 350–51, 225 A.2d 797 (1966). It is undisputed that the Greensphere Contract requires Greensphere to "accept[ ] all HRRA Acceptable Waste delivered to the Transfer Station," to "transport[ ] all such Acceptable Waste to [Wheelabrator]," and to not "knowingly ac-

cept . . . at the Transfer Station any Acceptable Waste . . . except as provided for in [the Greensphere Contract]." In return for these promises, Wheelabrator agreed to pay Greensphere a scheduled fee, on a "per ton" basis, for the amount of Acceptable Waste collected and delivered · to Wheelabrator. As already discussed, Greensphere admits that at all relevant times it has had the ability to perform its obligations under the Greensphere Contract, and continues to deliver at least some Acceptable Waste to Wheelabrator pursuant to the terms of the Greensphere Contract. "[I]n the twelve month periods ending June 30, 2000, the Transfer Station has processed and shipped to [Wheelabrator] on average more than 1,000 tons of Acceptable Waste *per month.*"

Further, the doctrine of frustration of purpose is inapplicable here because at the time of contracting, Wheelabrator and Greensphere foresaw the possibility that a "Change in [the] Law" such as *Carbone* might alter their ability to perform under the Greensphere Contract. *O'Hara v. Connecticut,* 218 Conn. 628, 638, 590 A.2d 948 (1991). As already discussed, the Greensphere Contract specifically details how the parties may avoid their obligations under the contract in the event ·that a "court order and/or judgment" has "a material adverse effect on [Wheelabrator] or [Greensphere], or on [Wheelabrator's] or [Greensphere's] ability to perform pursuant to [the Greensphere Contract]." Because· Wheelabrator and Greensphere "foresaw at the time of . . . contract[ing]" the likelihood of ·such a change in the law, as evidenced by the express terms of the Greensphere Contract, Greensphere may

---

8. Furthermore, "[d]isappointment at the level of income produced" from the contract does not equate to "an utter defeat of a party's objectives." *Wooldridge v. Exxon Corp.,* 39 Conn.Supp. 190, 194, 473 A.2d 1254 (Conn.Super.Ct.1984). "Mere economic hardship is not enough" to allow recission of the contract. *Id.* at 194, 473 A.2d 1254 (citing Restatement (Second), Contracts § 281).

not now rely on a change in the law to "excuse [its] performance" under the doctrine of frustration of purpose. *O'Hara v. Connecticut*, 218 Conn. 628, 638, 590 A.2d 948 (1991).

In light of the foregoing, the court concludes that the Greensphere Contract is not rendered unenforceable due to a frustration of purpose by *Carbone*.

Based upon all of the foregoing, the court concludes that the Greensphere Contract is valid and enforceable after *Carbone*. Accordingly, Wheelabrator's motion for partial summary judgment as to Greensphere's eighth counterclaim is granted and Greensphere's motion for partial summary judgment as to its eighth counterclaim is denied.

## II. *Count I of the Complaint—Breach of Contract*

In count one of the complaint, Wheelabrator alleges that in early 1997, Greensphere breached the Greensphere Contract by diverting some Acceptable Waste received at the Transfer Station to other, non-Wheelabrator operated resource recovery facilities. Both Wheelabrator and Greensphere now move for partial summary judgment as to count one of the complaint, each arguing that there are no genuine issues of material fact as to whether or not Greensphere breached the Greensphere Contract and that they are, respectively, entitled to a judgment as a matter of law.

Wheelabrator argues that it is undisputed that Greensphere "divert[ed] thousands of tons of HRRA waste away from [Wheelabrator]" in violation of the Greensphere Contract. Specifically, Wheelabrator argues that at the direction of Galante, the Transfer Station operators "made no effort to ensure that Acceptable Waste received at the Transfer Station was delivered to Wheelabrator" and "knowingly caused or allowed significant amounts of such HRRA waste to be shipped from the Transfer Station to non-Wheelabrator [resource recovery] facilities." Wheelabrator further argues that the term "Acceptable Waste" in the Greensphere Contract has at all relevant times meant MSW "generated and collected for disposal within each Participating Municipality." Wheelabrator finally argues that although the Greensphere Contract only bound Greensphere, and not TSI, to ensure that Acceptable Waste received at the Transfer Station was transferred to Wheelabrator, and that Greensphere was not required to "enforce flow control" of Acceptable Waste by "policing" the haulers, the Greensphere Contract did require Greensphere to be the "gatekeeper" of all waste delivered to any of the transfer operations located at the *one* Transfer Station on the "Transfer Station site."

Greensphere responds that Wheelabrator is not entitled to judgment because "the undisputed record reveals that for every ton of Acceptable Waste delivered to Greensphere, one ton was in fact delivered to [Wheelabrator]" and that Wheelabrator's position requires the court to rewrite the terms of the Greensphere Contract. Specifically, Greensphere argues that "Acceptable Waste" does not mean "all waste generated within an HRRA member community," and that after *Carbone*, and the loss of "ordinance flow control" of MSW, waste generated in a Member Municipality is "Acceptable Waste" only if the private waste hauler delivering it to the Transfer Station designates it as such. Greensphere also argues that the Greensphere Contract only required Greensphere, not TSI, "to deliver Acceptable Waste" to Wheelabrator, and thus, Greensphere is not liable for breach of contract if TSI receives "Acceptable Waste" at its waste transfer operations at the Transfer Station

site, but does not deliver it to Wheelabrator. Greensphere finally argues that the Greensphere Contract does not require Greensphere to "enforce flow control" of Acceptable Waste by "policing" the haulers, and thus, Greensphere is not liable for breach of contract if the haulers do not deliver Acceptable Waste to Greensphere.[9]

 "Absent ... definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." *Bead Chain Mfg. Co. v. Saxton Prods., Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981). "[S]ummary judgment based upon construction of a contract is appropriate only if the meaning of the language is clear, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language." *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995); *see also Barnard v. Barnard,* 214 Conn. 99, 109–110, 570 A.2d 690 (1990). "A contract should be interpreted in a way that ascribes meaning, if possible, to all of its terms, and where it is susceptible to more than one reasonable interpretation, its construction is a question of fact for trial, and summary judgment is inappropriate." *Arledge v. Stratmar Sys., Inc.,* 948 F.2d 845, 850 (2d Cir. 1991) (internal citations omitted).

Upon its review of the evidence submitted in support of the within cross-motions for summary judgment, the court concludes that genuine issues of material fact prevent the court from granting judgment in favor of either Wheelabrator or Greensphere as to count one of the complaint. Accordingly, Wheelabrator's motion for partial summary judgment as to count one of the complaint is denied and Greensphere's motion for partial summary judgment as to count one of the complaint is denied.

### CONCLUSION

For the reasons stated herein, Wheelabrator's motion for partial summary judgment (document no. 80) is GRANTED IN PART and DENIED IN PART, and Greensphere's motion for partial summary judgment (document no. 87) is DENIED.

---

9. Greensphere also advances here, in connection with count one of the complaint, its "frustration of purpose" and "public policy" arguments, first discussed *supra* in connection with Greensphere's eighth counterclaim. The court rejected these arguments above and rejects them here, with respect to count one of the complaint, for the same reasons already discussed.