John F. LAWRENCE

v.

**THE RICHMAN GROUP CAPITAL
CORPORATION et al.**

No. 3:03 CV 850(JBA),
3:04 CV 166(JBA).

United States District Court,
D. Connecticut.

March 4, 2005.

David R. Schaefer, Brian P. Daniels, Ruth Ann Azeredo, Brenner, Saltzman & Wallman, New Haven, CT, Janet K. Decosta, Law Offices of Janet K. Decosta, Washington, DC, for Plaintiff.

Peter M. Nolin, Sandak Hennessey & Greco, Stamford, CT, Kerri L. Ruttenberg, King & Spalding, Washington, DC, David A. Ball, Richard Slavin, Stuart M. Katz, Cohen & Wolf, P.C., Bridgeport, CT, for Defendants.

***Rulings on Defendant's Motion to Dismiss [Doc. #104]; Plaintiff's Motion to Add Defendants [Doc. #100]; and Defendants' Motion to Strike [Doc. #102]***

ARTERTON, District Judge.

Plaintiff John R. Lawrence ("Lawrence") is licensed as a Series 7 General Securities Registered Representative with the National Association of Securities Dealers, Inc. ("NASD"). His claims in this action arise out of defendants' use of other representatives to market TRG investment funds, which Lawrence alleges is contrary to his mutual exclusivity agreement with defendants, and deprived him of commissions to which he is entitled. This is the second such suit brought by plaintiff, and has been consolidated with the first, *Lawrence v. The Richman Group of Connecticut, LLC,* 3:03cv850 (JBA) ("First Lawrence Action"), as both involve essentially the same factual background.

Defendants in this second action include The Richman Group, Inc. ("TRG, Inc.") and The Richman Group Capital Corporation ("TRG Capital"), which are syndicators of real estate limited partnerships created as investment vehicles for institutional investors (the "TRG Funds"); Richman Asset Management, LLC ("Richman Asset"), which manages the TRG Funds; and The Richman Group of New York LLC ("TRGNY"), which is responsible for marketing and investment program development. Lawrence believes that TRG, Inc., TRG Capital, and/or Richman Asset ultimately control the TRG Funds in relation to him. Defendants also include various TRG Funds and the entities described as general partners or sole managing

members of those TRG Funds, which also control the Funds vis-à-vis Lawrence.[1]

Like his complaint in the First Lawrence Action, plaintiff's claims in this case are based on alleged oral and written communications between plaintiff and Stephen B. Smith, the Executive Vice President of TRG, Inc., TRG Capital, and all defendant TRG Funds, concerning the sale of securities of the TRG Funds.[2] As set forth in Lawrence's Amended Complaint, Lawrence approached TRG, Inc. and TRG Capital in late 1997 or early 1998 with an investment fund concept known as the "Bank Fund" which would "enable institutional banking investors to invest in affordable housing located in specifically targeted geographic areas." Amended Complaint at ¶ 22. Smith agreed that TRG, Inc. or TRG Capital would syndicate the Bank Fund if Lawrence could introduce institutional banking investors willing to invest an aggregate of at least twenty million dollars, and that Lawrence would have "the exclusive right to market to institutional banking investors nationwide the TRG Funds, including the Bank Fund." *See id.* at ¶ 33.

After Lawrence discovered that Beacon Hill Capital Corporation ("Beacon Hill"), a non-party broker/dealer, had contacted institutional banking investors about investing in the Bank Fund, Smith and Lawrence created a "Registered Client" list "wherein the institutional banking investors that Lawrence contacted regarding investing in the Bank Fund were listed as Lawrence's clients." *Id.* at ¶ 40. Beginning in August 1998 through early 1999, Smith and Lawrence came to an agreement whereby Lawrence was given the exclusive right to market any TRG Funds, including Bank Fund, to his Registered Clients (with the exception of Comerica and U.S. Bancorp which also could be solicited by Beacon Hill Capital Corporation), and in return Lawrence agreed that

---

1. These defendants include U.S.A. Institutional Tax Credit Fund XXVII L.P.; Richman U.S.A. Tax Credit XXVII L.P.; Richman U.S.A. Tax Credit XXVII, Inc.; U.S.A. Institutional Tax Credit Fund XXVIII L.P.; Richman U.S.A. Tax Credit XXVIII L.P.; Richman U.S.A. Tax Credit XXVIII, Inc.; U.S.A. Institutional Tax Credit Fund XXX L.P.; Richman U.S.A. Tax Credit XXX LLC; U.S.A. Institutional Tax Credit Fund XXXII L.P.; Richman U.S.A. Tax Credit XXXII LLC; The Richman Family Irrevocable Grantor Trust Dated June 1, 2002; U.S.A. Institutional Tax Credit Fund XXXIV L.P.; Richman U.S.A. Tax Credit XXXIV LLC; U.S.A. Institutional Tax Credit Fund XXXV L.P.; Richman U.S.A. Tax Credit XXXV LLC; Richman U.S.A. Manager, Inc.; U.S.A. Institutional Tax Credit Fund XXXVI L.P.; U.S.A. Institutional Tax Credit Fund XXXVIII L.P.; U.S.A./Fleet Institutional Tax Credit Fund XX–A L.P.; U.S.A. Institutional Tax Credit Fund XX–C L.P.; Richman U.S.A. Tax Credit XX L.P.; and Richman U.S.A. Tax Credit XX, Inc.

Plaintiff has moved to add Defendants U.S.A. Institutional Tax Credit Fund XXXVIII L.P. and U.S.A. Institutional Tax Credit Fund XXXVI L.P. [Doc. # 100]. Defendants op-

pose, and move to strike on grounds that these funds did not exist at the time of the alleged contract with the other defendants. *See* [Docs. # 101, 102]. Rule 15(a) of the Federal Rules of Civil Procedure provides that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served ...." Because plaintiff's motion to add defendants constitutes Lawrence's first attempt to amend his complaint, and it precedes any responsive pleading by any defendant, it is permitted as a matter of right under Rule 15. *See Washington v. New York City Bd. of Estimate,* 709 F.2d 792, 795 (2d Cir.1983). Because these defendant funds may be added as a matter of right, plaintiff's motion to add defendants [Doc. # 100] is granted, and defendants' motion to strike [Doc. # 102] is denied. The Court will deem the new defendants to have joined the instant motion to dismiss.

2. Stephen Smith is also the Executive Vice President of The Richman Group of Connecticut, the defendant in the First Lawrence Action.

he "would perform services exclusively for Defendants and [ ] he would not introduce any institutional banking investors to any other syndicator." *Id.* at ¶ 46. Smith agreed that TRG would compensate Lawrence with a commission of $12,500 for each one million dollar limited partnership unit of Bank Fund sold to the Lawrence Registered Clients, and $7,500 for each one million dollar limited partnership unit of any other TRG Fund sold to the Lawrence Registered Clients. *Id.* at ¶¶ 49, 51. Lawrence states that he "performed services exclusively for Defendants and did not introduce any institutional banking investors to any other syndicator," *id.* at ¶ 46, and "did not pursue opportunities to develop and market competing investment products with other syndicators," *id.* at ¶ 58, but that defendants breached the exclusivity agreement with Lawrence by using other brokers and representatives to solicit Lawrence Registered Clients to invest in its Funds. According to Lawrence, defendants reduced, eliminated, or returned commission fees to the Lawrence Registered Clients in order to make investing in the TRG Funds more attractive to them. *See id.* at ¶ 91. As a result of defendants' conduct, Lawrence alleges that he has been denied compensation that is due to him.

## II. Discussion

Defendants move to dismiss Lawrence's complaint based on Lawrence's acknowledgment that they were not registered with the appropriate federal and state authorities. They argue that in the absence of registration, any contract Lawrence may have had with them would be illegal and unenforceable under federal law and the applicable Connecticut and Maryland statutes, where defendants contend Lawrence was required to register.[3]

In his Amended Complaint, Lawrence states that he is a registered representative, and, as both sides agree, he is therefore an "associated person" within the meaning of the Securities and Exchange Act.[4] Lawrence acknowledges, however, that he is not a registered representative of defendants, because defendants themselves are not registered broker-dealers. According to his Amended Complaint, "[u]pon information and belief, none of TRG, Inc., TRG Capital or TRGNY were

---

**3.** Because this Court concludes that the contract Lawrence alleges is void on the face of his complaint under federal securities law, the Court finds it unnecessary to decide the applicability of the Connecticut or Maryland statutes.

**4.** The term "person associated with a broker or dealer" is defined by statute as "any partner, officer, director, or branch manner of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer, except that any person associated with a broker or dealer whose functions are solely clerical or ministerial shall not be included in the meaning of such term ..." 15 U.S.C. § 78c(18). The SEC has interpreted "the term associated

person to include any independent contractor, consultant, franchisee, or other person providing services to a broker-dealer equivalent to those services provided by the persons specifically referenced in the statute." Securities and Exchange Commission, Books and Records Requirements for Brokers and Dealers Under the Securities Exchange Act of 1934, 66 Fed.Reg. 55818–01, 2001 WL 1343460 (Nov. 2, 2001) ("The Commission has consistently taken the position that independent contractors (who are not themselves registered as broker-dealers) involved in the sale of securities on behalf of a broker-dealer are "controlled by" the broker-dealer, and, therefore, are associated persons of the broker-dealer.... A similar analysis would be applicable to other persons, such as consultants and franchisees, performing securities activities with or for the broker-dealer.").

registered as brokers in accordance with all applicable federal and state laws to solicit the Lawrence Registered Clients for investments in TRG Funds." Amended Complaint ¶ 96. Because the alleged contract described in Lawrence's complaint was for Lawrence to act as defendants' agent in soliciting investors for the TRG Funds, and Lawrence alleges that defendants were not properly registered broker-dealers, defendants argue that the performance of the alleged contract would not be legal, and should be declared void.

In arguing that the contract Lawrence alleges is unenforceable, defendants are not themselves acknowledging any impropriety on their part before the Securities and Exchange Commission ("SEC") or National Association of Securities Dealers ("NASD"). In this regard, defendants assert, and Lawrence has acknowledged in a prior suit before this Court, that Lawrence is an associated person of the Wilder Richman Securities Corporation ("Wilder Richman"), which is affiliated with defendants but is not named as a defendant in this action. The history of the litigation between these parties deserves further description. On October 12, 2002, The Richman Group, Inc. ("TRG, Inc."), a defendant in the present case, along with TRG–LLC, and Wilder Richman, filed suit against Lawrence seeking a declaratory judgment as to the obligations they owed him, and moved to compel arbitration, on grounds that the U–4 Uniform Application for Securities Industry Registration, entered into by Lawrence and listing Wilder Richman as Lawrence's employer, required arbitration of any dispute. *See The Richman Group, Inc. et al. v. Lawrence*, 3:03cv1940 (JBA) ("1940 Action"). Lawrence separately filed suit against The Richman Group of Connecticut, LLC. on December 18, 2002, asserting claims substantially similar to those in this case, as discussed above.

*See Lawrence v. Richman Group of Connecticut LLC*, 3:03cv850 (JBA) ("First Lawrence Action"). Lawrence opposed the motion to compel arbitration in the 1940 action. Although he conceded that he was an "associated person" of Wilder Richman, and therefore would be required to arbitrate any claims against Wilder Richman, he maintained that he had no claim against Wilder Richman or The Richman Group, Inc. Based on this representation, this Court denied the motion to compel arbitration, reasoning:

> Mr. Lawrence, who is the person claiming to have been wronged, insists that his dispute is with the Richman Group of Connecticut only, and that is his choice on who to bring a claim against or not bring a claim against. . . . The only person . . . against whom Mr. Lawrence has asserted any type of claim for relief is not, by undisputed account, a member or associated person [of the NASD], and the NASD rules simply do not permit, therefore, any of the entities who are members or associated persons, namely Wilder Richman and the Richman Group Inc. to compel arbitration of Mr. Lawrence's claims against a nonmember, not associated person.

Transcript of Oral Argument on Motion to Compel Arbitration, July 14, 2003 [Doc. # 104, Ex. B] at 26.

This Court noted that Lawrence's choice of whom to sue could have repercussions, however, "in that the entity he has chosen to sue may have few assets, or it may be in the nature of an affirmative defense the fact that his securities could only by law be sold through Wilder, and that may hinder Mr. Lawrence's chances of recovery by his insistence that he only has a dispute against the Richman Group of Connecticut." *Id.* Subsequent to the issuance of the decision denying their motion to compel, plaintiffs in the 1940 action voluntarily

dismissed their suit. Lawrence commenced the instant suit on January 30, 2004, asserting claims against The Richman Group, Inc. along with others, but continued to refrain from making a claim against Wilder Richman.

Section 15 of the Securities and Exchange Act provides that "[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and *every contract* (including any contract for listing a security on an exchange) heretofore or hereafter made, *the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . ." 15 U.S.C. § 78cc(b) (emphasis added).

The registration requirement on which defendants base their claim of contract illegality is contained in 15 U.S.C. § 78o(a)(1), which provides:

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in

accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).

By its terms, section 78o(a)(1) exempts persons associated with a broker-dealer from the registration requirement.

Lawrence challenges defendants' illegality argument on two central grounds: first, he argues that the illegality argument must be raised by affirmative defense, and is not appropriate for disposition by a motion to dismiss; second, he contends that his registration as a representative of the Wilder Richman Securities Corporation is sufficient to lend propriety to his dealings with defendants and on defendants' behalf, even though he does not claim that Wilder Richman has financial responsibility for any compensation due to him nor wish to name Wilder Richman as a defendant in this action.

**A. Affirmative Defense**

 Rule 8(c) of the Federal Rules of Civil Procedure provides that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively . . . illegality . . . and any other matter constituting an avoidance or affirmative defense." As a general rule, therefore, disposition of such an affirmative defense would not be appropriate at the motion to dismiss stage, because the burden of proving an affirmative defense is on the defendant, and the plaintiff is under no obligation to anticipate and include allegations in his complaint negating that defense. *See, e.g. Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) ("We see no basis for imposing on the plaintiff an obligation to anticipate such a defense."). An exception exists, however, where the affirmative defense appears on the face of the complaint. In such circumstances, the "affirmative defense may be raised by a pre-answer motion to dismiss under Rule

12(b)(6), without resort to summary judgment procedure." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998). Judicial notice of the undisputed facts established in prior litigation between these parties is also proper. "[W]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer." *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992).[5]

As plaintiff notes, even where a defense appears on the face of the complaint or may be judicially noticed, dismissal is not required, and there may be situations in which either allowing amendment of the complaint or proceeding to a fully developed summary judgment record would be more appropriate. *See Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 49–50 (2d Cir.1997) ("[T]he fact that a complaint alleges facts that constitute a defense to plaintiff's claim does not in all cases require dismissal of the complaint."); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1226, at 209–10 (1990) ("The court, in its discretion, may allow the pleader to amend his complaint if it believes that the defense can be avoided. . . . Even if the defense is absolute on the face of the complaint, the court may decide that a motion for summary judgment, which provides an opportunity for an investigation of the facts surrounding the bare allegations in the pleading, is more appropriate and more productive in terms of reaching the merits than a motion to dismiss under Rule 12(b)(6).").

Here, in light of Lawrence's description in his complaint of his status as a registered representative and defendants' lack of registration as a broker-dealer, the nature of defendants' illegality defense appears on the face of the complaint, and resolution at the motion to dismiss stage is permissible. The basis for defendant's motion is not the absence of allegations that plaintiff was registered as their agent, but rather affirmative claims by plaintiff that defendants are not registered broker-dealers. It is appropriate to decide the illegality issue now, moreover, because Lawrence was allowed leave to amend his complaint after defendants indicated their intention to move for dismissal on this basis during the pre-filing conference on April 1, 2004,[6] the nature of the registration was the subject of a prior judicial determination, and Lawrence has been consistent in his allegations in three separately filed lawsuits that he does not pur-

---

**5.** "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (citation and internal quotation marks omitted). Judicial notice is permitted of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The Court may thus take judicial notice of "prior pleadings, orders, judgments, and other items appearing in the Court's records of prior litigation that is closely related to the case sub judice," particularly where the facts were not disputed in the prior litigation. *Hackett v. Storey,* No. 3:03CV395 (JBA), 2003 WL 23100328, *2 (D.Conn. Dec.30, 2003) (citations omitted).

**6.** *See* Transcript of Telephonic Status Conference, April 1, 2004 [Doc. # 106, Ex. A] at 36 ("The Court: I'm going to give you time to amend your complaint, and then you can make those arguments that you don't have it, have it in your complaint . . . And you have the outline of what the motion to dismiss is going to be because the defendant provided it in connection with their motion for a prefiling conference, so you know what you're pleading against, in other words.").

sue any claims at this time against Wilder Richman, the entity through which he is registered. Moreover, in opposing the motion to dismiss, plaintiff does not indicate that he wishes to modify his allegation in the complaint that defendants are not registered broker-dealers. Thus, under the particular circumstances of this case, permitting plaintiff to amend his complaint or proceeding to summary judgment to allow further development of the factual record would serve no productive end.

### B. Effect of Wilder Richman Registration

While Lawrence acknowledges that he was a registered representative through Wilder Richman, not defendants, he contends that the services he provided to defendants were permitted by his registration with Wilder Richman but did not constitute a contract for compensation between Lawrence and Wilder Richman. In effect, Lawrence's claim is that his registration with Wilder Richman allowed him to transact business on behalf of defendants, and that he provided services exclusively for defendants, not Wilder Richman. Lawrence's position is inconsistent with federal securities law. Under this regulatory framework, Lawrence cannot have a valid contract exclusively with the unregistered defendants to act as their agent in soliciting investors for the TRG Funds. For the arrangement Lawrence has alleged to be valid, he would need to have been acting in his capacity as an associated person of Wilder Richman, the only registered entity, in undertaking the transactions for which he now seeks compensation. Lawrence, by his own allegations, has disclaimed such a possibility.

Registration is the "keystone of the entire system of broker-dealer regulation." *Roth v. Securities and Exchange Commission*, 22 F.3d 1108, 1109 (D.C.Cir.1994) (quoting Frank W. Leonesio, Exchange Act Release No. 23,524, 36 SEC Docket 457, 464 (Aug. 11, 1986)). "Once registered, a broker-dealer is required to comply with specific record keeping, financial compliance, and financial reporting requirements. The record keeping provisions require maintenance of numerous records regarding, among other matters, securities transactions, positions held in securities, ordered received and given, as well as the receipt and disbursement of various funds." David A. Lipton, *A Primer on Broker–Dealer Registration*, 36 Cath. U.L.Rev. 899, 907 (Summer 1987). Registration also subjects the registrant to Securities and Exchange Commission discipline and inspections.

Thus, registration is more than a formality. It requires the broker-dealer to exercise a degree of control over an associated person because the associated person is ultimately representing that registered broker-dealer in effecting securities transactions. In fact, associated persons are defined as "any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer." 15 U.S.C. § 78c(18). Lawrence, however, has alleged that the unregistered defendants "TRG, Inc, TRG Capital, and/or Richman Asset," not Wilder Richman, "ultimately control the TRG Funds vis-a-via Lawrence." Amended Complaint at ¶ 9.

In *Roth*, the D.C. Circuit considered whether an individual who was a registered representative of a member firm of the National Association of Securities Dealers, and was therefore a person associated with a registered broker-dealer, could be exempted from the registration requirement when engaging in separate, unaffiliated private securities transactions. The D.C. Circuit accepted the SEC's position and held that the registration exemption in 15 U.S.C. § 78o(a)(1) for persons

associated with a broker-dealer "applies only if the person is acting within the 'scope' of his or her association with the member firm." *Roth*, 22 F.3d at 1109. The Court of Appeals explained:

> The language of § 15(a)(1) does not make plain whether registered representatives like Roth are always exempt from registration as broker-dealers, or whether the exemption from broker-dealer registration extends only to those individuals subject to the supervisory relationship which normally accompanies association with a member firm. The SEC's resolution of this ambiguity is reasonable in light of the structure and evident purposes of the statutory scheme. Roth's contrary reading would leave the exemption with no reason to exist. Why would Congress exempt from registration those natural persons associated with a registered entity unless it reposed faith in the latter's supervision? If an individual is operating as a broker-dealer outside the course and scope of his employment, the employer's registration would seem to have little relevance.

*Id.*

Like *Roth*, here Lawrence has made clear in his complaint and in prior litigation that his contract with defendants to solicit investors for the TRG Funds was *not* within the scope of his status as an associated person of a registered broker-dealer. This is because Lawrence's central contention is that he was acting on behalf of the defendant Richman entities, not Wilder Richman, in soliciting investors for his Bank Fund concept, and that therefore the defendant entities bear financial

responsibility for paying him the compensation he is due.[7]

Lawrence argues that Wilder Richman need only be aware of and consent to his contract with defendants—facts not precluded by Lawrence's complaint—in order for the contract to be valid. In his reply brief on his Motion for a Preliminary Injunction in his related case, *Lawrence v. Wilder Richman Securities Corp.*, 3:04cv538 (JBA), Lawrence expanded this argument for the first time in analyzing the "selling away" provisions of NASD Rule 3040, which he contends apply to his transactions on behalf of the defendant Richman entities, and would make his contract with the defendant Richman entities legal if he obtained permission for the transactions from Wilder Richman, even if he was not acting on behalf of Wilder Richman in engaging in the transactions.

Rule 3040 provides:

(a) No person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this Rule.

(b) Prior to participating in any private securities transaction, an associated person shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with the transaction.

(c)(1) In the case of a transaction in which an associated person has received or may receive selling compensation, a member which

---

**7.** Lawrence states that he has a good faith basis for believing that defendants, not Wilder Richman, bear the financial responsibility for any compensation due him, and points to allegations in his Amended Complaint that

"from 1998 through 2001, the vast majority of the compensation payments made to Lawrence were paid directly by the respective TRG Funds," which "also issued Lawrence tax Form 1099's." Amended Complaint ¶ 76.

has received notice pursuant to paragraph (b) shall advise the associated person in writing whether the member:

(A) approves the person's participation in the proposed transaction; or

(B) disapproves the person's participation in the proposed transaction.

(2) If the member approves a person's participation in a transaction pursuant to paragraph (c)(1), the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the member.

(3) If the member disapproves a person's participation pursuant to paragraph (c)(1), the person shall not participate in the transaction in any manner, directly or indirectly.

"Private securities transaction" is defined under Rule 3040 as "any securities transaction outside the regular course or scope of an associated person's employment with a member, including, though not limited to, new offerings of securities which are not registered with the Commission . . . ." As the Securities and Exchange Commission has explained, "Rule 3040 serves not only to protect investors, but also to permit securities firms, which may be subject to liability in connection with transactions in which their representatives become involved, to supervise such transactions." *In the Matter of the Application of Joseph Vastano, Jr. for Review of Disciplinary Action Taken by NASD*, S.E.C. Release No. 34–50219, 2004 WL 1857139 (Aug 19, 2004).

At oral argument, plaintiff's counsel maintained that the transactions that form the basis of this suit were "private securities transactions" within the meaning of Rule 3040, and that the requisite written approval from Wilder Richman came through Stephen Smith, who served simultaneously as Executive Vice–President of defendants TRG, Inc., The Richman Group Capital Corporation, The Richman Group of Connecticut, and each affiliated investment fund limited partnership, *and* Wilder Richman. The allegations in Lawrence's complaint in this and in his related action preclude the existence of express written notice and consent from Wilder Richman, however. Lawrence has alleged that Smith and others with whom he dealt in reaching agreement on the transactions at issue "acted on behalf of Defendants." *See* Amended Complaint ¶¶ 26–28. While standing alone, this allegation would not preclude the possibility that Smith and others also acted on behalf of Wilder Richman, Lawrence has also alleged in his verified complaint in the '538 Action that "[t]he written communications from Smith to Lawrence generally exhibited TRGCT or TRG Capital letterhead or e-mail addresses and *did not exhibit WRSC letterhead or e-mail addresses.*" Complaint [Doc. # 1] at ¶ 47; Affidavit of John F. Lawrence [Doc. # 6] (verifying complaint) (emphasis added).[8] Because NASD Rule 3040 expressly requires written approval from Wilder Richman, Lawrence's allegations negate the applicability of NASD Rule 3040.[9]

---

8. Although this allegation is set forth in a related case, judicial notice of this verified claim is appropriate. *See supra* n. 5.

9. Moreover, Lawrence has alleged that the defendant Richman entities "ultimately control the TRG Funds vis-a-vis Lawrence." Amended Complaint at ¶ 9. This allegation is at odds with the NASD requirement that Wilder Richman "supervise the person's partic-

Lawrence argued in his supplemental memorandum in the related 538 action, that "[n]either [Wilder Richman] nor its affiliates can dispute that Smith was advised of Lawrence's activities, from time to time requested that Lawrence undertake such activities, and fully approved of same, with a myriad of written communications documenting such undertakings. The highly centralized control of the Richman Group entities, including through Smith, requires the conclusion that Smith's activities on behalf of any one of the Richman Group entities was, to the extent necessary, with the knowledge and permission of any other Richman Group entity with which he held a position of responsibility." Plaintiff's Memorandum in Further Support of Motion for Preliminary Injunction [Doc. # 29, Ex. A] at 5. In effect, Lawrence appears to assert that written consent from Wilder Richman may be implied because Smith, by virtue of his multiple hats, *de facto* was acting in the regular course of his employment as Executive Vice President of Wilder Richman in approving Lawrence's transactions on behalf of the defendant Richman entities. The Court disagrees that implied notice to and consent from Wilder Richman would satisfy Rule 3040, because permitting the member's consent to be implied, rather than express and in the requisite detailed form, would threaten to swallow the general rule of NASD Rule 3040 prohibiting associated persons from engaging in private securities transactions. Traditional canons of construction therefore prohibit such a broad construction, *see, e.g. Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989) ("In construing [statutory] provisions ..., in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary

operation of the provision."), and NASD regulatory decisions reflect a narrow view of what constitutes written consent. *See, e.g. In the Matter of District Business Conduct Committee for District No. 8, Complainant v. Ronald J. Gogul and Christopher E. Peta,* Complaint No. C8B920029, 1994 WL 1067229 (February 4, 1994) (rejecting respondents' contention that the NASD member firm was on notice where "respondents did not specifically advise RTS of their intended participation" in the private securities transaction, even though a memorandum provided to the NASD member contained general notice of a related transaction, and also finding that "the requirements of [Rule 3040] regarding ongoing participation in private securities transactions would not be satisfied with one written notice."). Further, the kind of implied notice Lawrence sets forth requires assumptions about what occurs in the regular course and scope of employment with Wilder Richman. To the extent the communications regarding the transaction took place as part of the regular course of one's employment with a member firm, the transaction would not be a "private securities transaction" within the meaning of Rule 3040 (though such a transaction could be legal, with the contract subject to arbitration).

■ Accordingly, the Court concludes that Lawrence's position would render the registration requirement meaningless. There is no way to read Lawrence's complaint, and the consistent position he has taken as to Wilder Richman in this and prior litigation, to allege that he represented Wilder Richman, through whom he was registered, in soliciting Bank Fund investors, and Lawrence's allegations preclude application of NASD Rule 3040. The Court thus concludes that Lawrence has alleged an illegal contract, the perform-

ipation in the transaction as if the transaction were executed on behalf of the member."

**40**

ance of which is unenforceable under 15 U.S.C. § 78cc(b). Count I of the complaint, for breach of contract, is dismissed.

At oral argument, counsel for plaintiff offered to amend plaintiffs' complaint to allege compliance with NASD Rule 3040.[10] The Court will permit such amendment, and will reconsider this decision if plaintiff amends his complaint such that those allegations now precluding application of NASD Rule 3040 are modified, and plaintiffs' amended allegations are in accordance with the above construction of NASD Rule 3040. That is, to satisfy Rule 3040, plaintiff must have given detailed written notice of each proposed transaction *expressly* to Wilder Richman, and must have received express written consent from Wilder Richman.[11]

### C. Lawrence's Remaining Claims

The remaining claims in Lawrence's complaint allege breach of the implied covenant of good faith and fair dealing (Count II), conversion (Count III), Statutory Theft under Conn. Gen.Stat. § 52–564 (Count IV), unjust enrichment (Count V), and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count VI). Defendants argue that because all of these claims are based on the underlying

contract, they too must be dismissed. Defendants also argue that the claims should be denied on their merits. The Court agrees as to all but Lawrence's unjust enrichment claim, for the following reasons.

"It is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract...." *Solomon v. Gilmore*, 248 Conn. 769, 785, 731 A.2d 280 (1999).[12] Lawrence's bad faith, conversion, statutory theft, and CUTPA claims each depend on the existence of a valid contract, in the absence of which, Lawrence cannot imply a good faith covenant, claim an ownership right to the commissions, or prove that the non-payment of commissions was unfair. As the Connecticut Supreme Court has reasoned as to a claim for breach of the covenant of good faith and fair dealing, "It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a con-

---

**10.** At oral argument, plaintiff's counsel maintained that implied consent would satisfy NASD Rule 3040. It is unclear, therefore, whether plaintiff's intended amendment would be based on such a theory of implied consent. For the reasons set forth above, the Court concludes that NASD Rule 3040 requires more than implied consent from the member firm.

**11.** There has been a significant amount of gamesmanship by both sides in their four related lawsuits, primarily in their efforts to avoid or require arbitration. While the Court finds that dismissal of plaintiff's contract claim is required on the face of his complaint, the reconsideration procedure set forth above will provide an efficient means for addressing

any amendments to the complaint reflecting plaintiff's new theory of Wilder Richman's involvement (which was not developed in the context of this motion to dismiss, but rather in the related '538 case).

**12.** In the First Lawrence Action, Lawrence disputed the choice of Connecticut law, and argued that Maryland law should apply. In the present case, however, Lawrence has relied predominately on Connecticut law in his opposition to defendant's motion to dismiss and has not brought to the Court's attention any differences in Maryland and Connecticut's approach to these issues. Therefore, the Court will rely on Connecticut law in addressing the remaining issues.

tract or a contractual relationship.... [Thus,] the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 749 A.2d 1144 (2000) (citations and internal quotation marks omitted).

Moreover, the conversion and statutory theft claims fail for the reasons set forth in this Court's September 30, 2004 decision in the First Lawrence Action. *See* [Doc. # 117]. Both statutory theft and conversion require plaintiff's ownership of the claimed stolen or converted property,[13] and

Lawrence has not alleged that he owned or at some point had possession or control of the monies he claims he is due.[14] *See id.* at 17–19, 749 A.2d 1144.

■■ Lawrence's CUTPA claim is deficient as well, even if the contract alleged were otherwise enforceable. In Count VI, Lawrence alleges first that defendant's conduct, as set forth above, offends public policy, is "immoral, unethical, oppressive or unscrupulous," and has caused him substantial injury. Amended Complaint at ¶ 147. While plaintiff has thus stated the formal elements of a CUTPA claim,[15] his claim merely incorporates by reference the

---

**13.** Conn. Gen.Stat. § 52–564 provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." The word "steals" as used in this section is synonymous with larceny as defined by the larceny statute, Conn. Gen.Stat. § 53a–119, which provides that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from [the] owner." The Connecticut Supreme Court defines conversion as "an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." *Macomber v. Travelers Property & Casualty Corp.*, 261 Conn. 620, 650, 804 A.2d 180 (2002). "Conversion can be distinguished from statutory theft as established by § 53a–119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct." *Suarez–Negrete v. Trotta*, 47 Conn.App. 517, 520–522, 705 A.2d 215 (Conn.App.1998) (citations omitted).

**14.** The cases relied on by Lawrence are distinguishable because in each, the plaintiff had a claim to ownership or possession of the monies prior to their conversion. In *Suarez–Negrete v. Trotta*, 47 Conn.App. 517, 518, 705 A.2d 215 (Conn.App.1998), for example, the plaintiff posted a bond to ensure his appearance at an immigration proceeding, and sought to recover the funds when defendant refused to return the funds after he fulfilled the conditions of the bond.

Likewise, in *Patel v. Dale Constr.*, No. CV030482221, 2004 WL 945132, at *2, 2004 Conn.Super. LEXIS 1017, at *4–7 (Conn.Super.Apr. 21, 2004), the plaintiff prevailed on his conversion and statutory theft claims where the defendant refused to return a deposit of $105,000 that plaintiff had paid defendant for the construction of a new house. *See also Veccharelli v. Valentina,* No. CV020389531S, 2004 WL 238002, at *3, 2004 Conn.Super. LEXIS 156, *8–10 (Conn.Super.Jan. 22, 2004) (plaintiffs were legal owners of death benefits of the life insurance policies); *Lepore v. Goldman*, No. CV010086509S, 2003 WL 1995274, *3, 2003 Conn.Super. LEXIS 1062, *4–5 (Conn.Super.Feb. 21, 2003) (defendant improperly received and retained $4,000 draw from plaintiff, after they were no longer bound by contract); *Goldberg v. Schatz & Schatz Ribicoff & Kotkin*, No. 91 0503628, 1992 WL 209951, *5, 1992 Conn.Super. LEXIS 2549, *11–12 (Conn.Super. August 20, 1992) (plaintiff alleged he a partner at defendant firm entitled to a 1.68% ownership of the firm's capital, and defendant improperly reduced the compensation to which he was entitled by virtue of his ownership interest).

**15.** To state a claim that a practice is unfair under CUTPA, a plaintiff must allege: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of un-

allegations giving rise to his breach of contract claim or to those claims dependent on the existence of a valid contract. A simple breach of contract is insufficient to establish a claim under CUTPA. *See Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038–39 (2d Cir.1995) (reviewing applicable Connecticut authority and concluding that a breach of contract standing alone does not offend public policy). As the Second Circuit reasoned in *Boulevard Associates*, "[a] rule to the contrary … would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law." *Id.* at 1039; *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 41 Conn.Supp. 575, 580, 595 A.2d 951 (1991) (plaintiff must allege "substantial aggravating circumstances attending the breach" of contract) (citations and internal quotation marks omitted).

■ In his CUTPA claim, Lawrence has also alleged that defendants made misrepresentations to Lawrence that were likely to mislead him and the Lawrence Registered Clients, were relied on by him and the Lawrence Registered Clients, and were material. *See* Amended Complaint at ¶ 147–48. Unlike his complaint in the First Lawrence Action, Lawrence here does not plead fraud or intentional misrepresentation [16] as separate counts in his complaint, nor would such claims meet the heightened pleading requirements of Fed. R.Civ.P. 9(b), as set forth in this Court's September 30, 2004 decision. *See* [Doc. # 117] at 6–12. Unlike a separate fraud claim, under CUTPA a plaintiff is not required to establish that a defendant had intent to deceive or knowingly made the misrepresentation. *See Web Press Servs. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 362–63, 525 A.2d 57 (1987); *Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 106, 612 A.2d 1130 (1992). In this case, however, Lawrence's allegations that defendants made misrepresentations to him would be distinguishable from his breach of contract claim only if there were some allegation of intent to deceive at the time defendants entered into the agreement with Lawrence. As discussed in the September 30, 2004 ruling, Lawrence's allegations in this regard are deficient. Lawrence's CUTPA count thus fails to state a claim on which relief may be granted.

■ Defendants argue that Count V of Lawrence's Amended Complaint, which alleges unjust enrichment, also springs from the unenforceable contract and should therefore be dismissed. Unjust enrichment is an equitable remedy, however, that "has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff." *Gagne v. Vaccaro*, 255 Conn. 390, 766 A.2d 416, 424 (2001). As the Supreme Court explained:

> Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract…. Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment. Not unlike quantum meruit, it is a doc-

---

fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ]." *Atlantic Richfield Co. v. Canaan Oil Co.*, 202 Conn. 234, 239, 520 A.2d 1008 (1987) (alterations in original).

**16.** Because Lawrence has not alleged that Smith's statements were carelessly made, the Court does not read Lawrence's complaint to include a claim for negligent misrepresentation.

trine based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff.

*Id.* at 424 (citations and internal quotation marks omitted).[17]

The three basic requirements of an unjust enrichment claim are that "(1) the defendant was benefitted, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment." *Id.* at 427–28. Neither party has addressed the application of this equitable doctrine to the allegations in this case.[18] Because an unjust enrichment claim may survive an invalid contract, this issue will be left for further record development.[19]

## III. Conclusion

For the reasons dismissed above, defendant's Motion to Dismiss [Doc. # 104] is GRANTED in part and DENIED in part. Counts I, II, III, IV, and VI of plaintiff's Amended Complaint are hereby dismissed. Plaintiff's motion to add defendants [Doc. # 100] is GRANTED, and defendants' motion to strike [Doc. # 102] is DENIED. The Clerk is directed to docket plaintiff's Amended Complaint, attached to Doc. # 100.

IT IS SO ORDERED.

---

17. The Restatement (Third) of Restitution and Unjust Enrichment § 32 (T.D. No. 3, 2004) provides:

 A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient in accordance with the following rules:
 (1) Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition.
 (2) Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.
 (3) Restitution will be denied, notwithstanding the enrichment of the defendant at the claimant's expense, if a claim under subsection (2) is foreclosed by the claimant's inequitable conduct (§ 62).

18. *Solomon v. Gilmore*, 248 Conn. 769, 731 A.2d 280 (1999), on which defendants rely, did not address the unjust enrichment issue. There are allegations in plaintiff's complaint that may go to the appropriateness of some equitable remedy, notwithstanding the illegality of the alleged contract. For example,

Lawrence alleges that "[u]pon information and belief, Smith and/or Richman are responsible for verifying that all brokers with which Defendants enter into selling agreements are properly licensed and registered in accordance with all applicable federal and state laws," and that "Defendants did not disclose to the Lawrence Registered Clients the lack of proper licensing and/or registration of Defendants, Defendants' employees (including Traylor), and defendants' third party brokers as aforesaid." Amended Complaint, at ¶¶ 29, 99.

19. Defendants argue broadly that plaintiff's entire complaint should be dismissed because he previously represented that he had no claims against any Richman entity other than the Richman Group of Connecticut (the subject of the First Lawrence Action), and that he could not make such a claim against the other Richman entities, because each Richman Group had a separate and distinct corporate structure. The Court disagrees that arguments made by counsel and representations of Lawrence in prior litigation preclude his recovery against defendants in this action. Lawrence's central claims in each of his lawsuits are based on alleged oral and written communications between him and Stephen B. Smith, and Lawrence is free to expand or amend his claims to reflect new information about the entities on behalf of which Smith was acting.